ORIGINAL

FILED IN OPEN COURT
U.S.D.C. - Atlanta

FEB 2 4 2022

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

*v.*

JACK FISHER, JAMES SINNOTT,
YEKATERINA LOPUHINA A/K/A
"EKATERINA LOPUKHINA"
A/K/A "KATE JOY," WALTER
DOUGLAS ROBERTS II, A/K/A
"TERRY ROBERTS," CLAY
MICHAEL WEIBEL, A/K/A
"CLAYTON WEIBEL," HERBERT
E. LEWIS, AND VICTOR SMITH

**First Superseding**

Criminal Indictment

No. 1:21-CR-00231-TCB-CMS

THE GRAND JURY CHARGES THAT:

At all times relevant to this Criminal Indictment:

## I. PERTINENT INDIVIDUALS AND ENTITIES

### A.   The Inland Capital Management, LLC Defendants

1.     JACK FISHER ("FISHER"), a resident of Alpharetta, Georgia was a certified public accountant ("CPA") and partner at an Atlanta-area accounting firm ("Accounting Firm 1"), when, in or around 2002, he left to run his own business.  Shortly thereafter, FISHER began organizing, marketing, promoting, and selling illegal tax shelters that FISHER described as "real estate investment funds."  These illegal tax shelters facilitated high-income taxpayers in claiming unwarranted and inflated charitable contribution tax deductions in connection with the donation of a conservation easement over land  (the "SCE Tax Shelters"

1

or "Tax Shelters"). FISHER sold the SCE Tax Shelters through an entity known today as Inland Capital Management, LLC ("ICM"). FISHER owned and operated numerous entities affiliated with ICM and its operations, including Preserve Communities, a purported development company where FISHER and many of his co-conspirators held executive roles.

2.     Since at least 2013, defendant JAMES SINNOTT ("SINNOTT"), a resident of Suwanee, Georgia, was a licensed attorney who partnered with FISHER to organize, market, promote, and sell the SCE Tax Shelters. Primarily, SINNOTT's work at ICM and Preserve Communities consisted of management and operations. From at least 2015 through the present, SINNOTT served as President and Chief Operations Officer of Preserve Communities.

3.     Since at least 2012, defendant YEKATERINA LOPUHINA a/k/a EKATERINA LOPUKHINA a/k/a KATE JOY, ("JOY"), a resident of Atlanta, Georgia, worked with FISHER and ICM as a Senior Investor/Advisor Relations. JOY assisted FISHER with the organization, marketing, promotion, and sale of the SCE Tax Shelters. JOY served as a primary point of contact for various CPAs and financial advisors that sold the Tax Shelters to clients (the "co-promoters").

4.     Attorney A, a co-conspirator known to the Grand Jury, worked for FISHER and ICM since at least 2012. Attorney A assisted FISHER, SINNOTT, and other co-conspirators with the organization, marketing, and promotion of the SCE Tax Shelters. Attorney A served as the Executive Vice President and General Counsel of Preserve Communities.

5.     Since in or around 2002, Land Planner-1, a co-conspirator known to the Grand Jury, worked with FISHER to provide land planning services. Land Planner-1 also worked with FISHER at Preserve Communities as Executive Vice President Land Planning. From 2010 through approximately 2019, Land Planner-1 also served as Chief Executive Officer of Land Conservancy 1.

B.    **The Appraiser Defendants**

6.    Defendant WALTER DOUGLAS ROBERTS II a/k/a TERRY ROBERTS ("ROBERTS"), a resident of Flat Rock, North Carolina, was a licensed appraiser based in Hendersonville, North Carolina who owned and operated Appraisal Firm 1.  Beginning in or around 2005, FISHER used ROBERTS and Appraisal Firm 1 to provide appraisals of the conservation easements for the Tax Shelters.

7.    Defendant CLAY MICHAEL WEIBEL a/k/a CLAYTON WEIBEL ("WEIBEL"), a resident of Atlanta, Georgia, was a licensed appraiser based in or around Atlanta, Georgia, who owned and operated Appraisal Firm 2.  Beginning in at least 2015, FISHER used WEIBEL and Appraisal Firm 2 to provide appraisals of the conservation easements for the Tax Shelters.

C.    **LEWIS and SMITH, and Co-Conspirators**

8.    From in or around 2012 through the date of this Superseding Indictment, defendant HERBERT E. LEWIS ("LEWIS"), an Atlanta-area resident, worked as an accountant and tax return preparer at Accounting Firm 2.  LEWIS earned his CPA license in or around 1984 and prepared tax returns for at least 25 years.  LEWIS promoted and sold units in the SCE Tax Shelters to his clients.

9.    From at least 2012 through the date of this Superseding Indictment, defendant VICTOR SMITH, an Atlanta-area resident, was a CPA and founding partner of Accounting Firm 2.  SMITH promoted and sold units in the SCE Tax Shelters to his clients.

10.    From in or around 2000 through the present, Stein Agee, a co-conspirator, worked as an accountant and later a partner at Accounting Firm 1.  Among other things, Agee prepared federal partnership tax returns and related forms and schedules for the SCE Tax Shelters and related entities from at least 2014 through 2018.  Stein Agee also promoted and sold units in the SCE Tax Shelters to his clients.

11.     From in or around 2005 through the present, Corey Agee, a co-conspirator, worked as an accountant. In or around 2007, Corey became a partner at Accounting Firm 1. In 2013, Corey Agee earned his CPA license. Corey Agee promoted and sold units in the SCE Tax Shelters to his clients.

**D.    Other Relevant Individuals and Entities**

12.     Individuals A and B owned land through a holding company and engaged in land transactions with FISHER, SINNOTT, and ICM that were used for the SCE Tax Shelters.

13.     "Land Conservancy 1" was a non-profit organization, founded in North Carolina. Prior to approximately 2007, Land Conservancy 1 was known as Land Conservancy 1(a) (collectively, "Land Conservancy 1"). Land Conservancy 1 accepted conservation easements in connection with FISHER's Tax Shelters.

14.     "Land Conservancy 2" was a non-profit organization founded in Pennsylvania. Land Conservancy 2 accepted conservation easements in connection with FISHER's Tax Shelters.

**The Internal Revenue Service and its Forms**

15.     The Internal Revenue Service ("IRS") was an agency of the United States Department of the Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the United States.

16.     An IRS Form 1040, U.S. Individual Income Tax Return ("Form 1040"), was a form used by U.S. taxpayers to report income, gains, losses, deductions, credits, and taxes that occurred during the tax year. Typically, a tax year for an individual income tax return began on January 1 of that year and concluded on December 31st of that same year.

17.     An IRS Form 1065, U.S. Return of Partnership Income ("Form 1065"), was an information return filed by partnerships to report information such as income, gains, losses, deductions, and credits. The income or loss incurred by the

partnership, along with each partner's capital contributed during the year was reported to each partner on a Schedule K-1. The Schedules K-1 were issued to both the IRS and each partner.

18.     An IRS Form 8283, Noncash Charitable Contributions ("Form 8283"), was a form taxpayers attached to their income tax returns to report information to the IRS about non-cash charitable donations, including conservation easement donations. Taxpayers claiming a deduction of more than $500,000 for a donated item were required to attach a qualified appraisal of the property to the taxpayer's return. The appraiser and the donee organization that received the property were required to sign the Form 8283.

## Partnerships and Pass-Through Entities

19.     Under the Internal Revenue Code (the "Code") and associated regulations, the term "partnership" included a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture was operated. A limited liability company ("LLC") with two or more members was treated as a partnership for federal income tax purposes unless it affirmatively elected to be treated as a corporation.

20.     A partnership was referred to as a "pass through" or "flow through" entity because it was not itself liable for income tax. Instead, its partners, or members, were proportionally liable, based on the income, losses, deductions, or credits "passed through" the entity. For example, a partnership would "pass through" to its individual partners certain tax deductions, including a conservation easement donation. The individual partners then reported their share of the deduction on their individual income tax return, Form 1040, and related schedules.

21.     If a partnership was organized with no business purpose—and existed only for the purpose of tax avoidance—then the partnership lacked economic substance and was disregarded under federal tax law.

22.    A transaction was treated as having economic substance if the transaction (1) changed in a meaningful way (apart from any federal income tax effects) the taxpayer's economic position , and (2) the taxpayer had a substantial purpose (apart from any federal income tax effects) for entering into the transaction.

## Charitable Deductions, Qualified Conservation Contributions, and Conservation Easements

23.    The Code and associated regulations allowed taxpayers to take a deduction on their tax return for any "charitable contribution" made within that tax year.  The amount of the deduction generally equaled the fair market value of the contributed property on the date of the contribution.

24.    When donating real property, generally, a taxpayer could not claim a charitable contribution deduction for a contribution of a partial interest in real property.  However, the Code and associated regulations made an exception for a "qualified conservation contribution."  A qualified conservation contribution was a contribution of a qualified real property interest, to a qualified organization, exclusively for conservation purposes.

25.    Properly structured, a conservation easement was one type of "qualified real property interest," recognized under the Code.  A conservation easement was a legal agreement through which a landowner and another party agreed to permanently restrict the development and use of the land with the purpose of achieving certain conservation and preservation goals in perpetuity.

26.    To qualify for this specific charitable deduction, the Code and associated regulations set out specific requirements, including, among other things, that the value of a conservation easement be determined by a qualified appraisal prepared no earlier than 60 days before the date of contribution and no later than the due date of the tax return on which the charitable contribution deduction was first claimed.

27.     Upon compliance with the requirements of the Code, the donor of the conservation easement could take a charitable contribution deduction for the fair market value (as appraised) of the donated property on their tax return.

28.     The fair market value of the conservation easement was generally determined to be the difference between the fair market value of the land before it was encumbered by the conservation easement and the fair market value of that same land after the easement was granted.

29.     When properly structured in accordance with the Code, a taxpayer could use the charitable deduction generated by the donation of the conservation easement to offset up to 50 percent of his or her taxable income for the relevant tax year of the donation.  If the taxpayer could not use the entire amount of the charitable deduction because it exceeded more than 50 percent of the taxpayer's taxable income for the relevant tax year, the taxpayer could carry forward the balance to use as a tax deduction against income for up to 15 years.

### The Scheme:  The SCE Tax Shelters

30.     FISHER began organizing, promoting, and selling SCE Tax Shelters as early as 2002.  From 2002 through 2012, FISHER organized and promoted approximately 11 SCE Tax Shelters, which placed conservation easements over land located within FISHER's two land development projects located in Western North Carolina:  The Preserve at Little Pine and French Broad Crossing.

31.     Beginning in at least 2013, FISHER expanded his operation and organized SCE Tax Shelters primarily using land not directly related to his own developments.  From at least 2013 through 2020, FISHER and his co-conspirators, through ICM, organized, promoted, and sold at least 15 SCE Tax Shelters for the purpose of generating fraudulent tax deductions for high-income taxpayers to shelter their income from taxes.  LEWIS, SMITH, Stein Agee, Corey Agee, and other co-promoters promoted and sold units in the various Tax Shelters to their clients (hereinafter "participants"), and in exchange, the participants received a tax deduction.  FISHER, SINNOTT, and JOY and co-promoters promoted the Tax Shelters as "tax advantaged real estate investments."  In reality, the SCE Tax

7

Shelters were illegal tax shelters that allowed taxpayers to buy tax deductions at the end of a tax year—and sometimes even after the tax year ended—to illegally shelter their income from taxes for that year.

32.     Typically, the conspirators caused each Tax Shelter to purchase an ownership interest, directly or through a holding entity, in another entity that owned vacant land (a "Property Company"). Then, each year, the conspirators caused the Property Company to place a conservation easement over the land it owned and then donate the easement to a land conservancy. In a few Tax Shelters, the conspirators caused the Property Company to also donate land in fee simple to charitable organizations.

33.     As part of the scheme, FISHER and SINNOTT, hired an appraiser, typically ROBERTS or WEIBEL, to generate fraudulent and inflated appraisals of the conservation easements or the land. In every instance, FISHER, SINNOTT, and other co-conspirators paid significantly less money to acquire the interest in the Property Company that held the land than the final inflated appraised value of the conservation easement or the land.

34.     In total, the defendants and their co-conspirators sold over $1.3 billion in false and fraudulent tax deductions through this syndicated conservation easement scheme.

### Count One
*Conspiracy to Defraud the United States*
(18 U.S.C. § 371)

35.     The Grand Jury re-alleges and incorporates by reference the factual allegations in paragraphs one through 34 of this Criminal Indictment.

36.     From at least in or about 2002 through at least 2020, both dates being approximate and inclusive, in the Northern District of Georgia and elsewhere, JACK FISHER, together with others known and unknown to the Grand Jury, including at various times YEKATERINA LOPUHINA a/k/a EKATERINA LOPUKHINA a/k/a KATE JOY, JAMES SINNOTT, WALTER D. ROBERTS II

a/k/a TERRY ROBERTS, CLAYTON WEIBEL, HERBERT E. LEWIS, and VICTOR SMITH, did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree to defraud the United States, by impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Department of Treasury in the ascertainment, computation, assessment, and collection of revenue, that is, U.S. individual income taxes.

## Object of the Conspiracy

37.    It was the purpose and object of the conspiracy for FISHER, JOY, SINNOTT, ROBERTS, WEIBEL, LEWIS, and SMITH (the "DEFENDANTS"), and their co-conspirators to unlawfully, voluntarily, intentionally, and knowingly defraud the United States of America and an agency thereof, that is, the Internal Revenue Service of the Department of Treasury, by impeding, impairing, defeating, and obstructing the lawful governmental functions of the IRS in the ascertainment, assessment, and collection of income taxes, through the organization, design, marketing, implementation, and sale of the fraudulent SCE Tax Shelters.

## Manner and Means

38. The DEFENDANTS, and others designed, organized, promoted, and sold the SCE Tax Shelters to high-income participants to claim false and fraudulent charitable contribution tax deductions that the conspirators attempted to disguise as legitimate transactions.  The manner and means by which the DEFENDANTS, and others known and unknown to the Grand Jury, carried out the objects of the conspiracy include the following, among others:

*Overview*

39.    FISHER, SINNOTT, and JOY, and other co-conspirators organized and promoted the fraudulent SCE Tax Shelters in a manner designed to disguise the fraudulent nature of the Tax Shelters and to maximize the size of the fraudulent charitable deductions that participants claimed on their tax returns.

40. The organization, design, marketing, promotion, and sale of the SCE Tax Shelter transactions were carried out by the co-conspirators in a similar manner.

a. FISHER and SINNOTT, with the assistance of various co-conspirators, identified land typically owned for at least one year by an existing Property Company.

b. FISHER, SINNOTT, and other co-conspirators created an SCE Tax Shelter entity, usually in the form of an LLC, to buy a significant interest in a Property Company instead of purchasing the land directly from the Property Company.

c. FISHER, SINNOTT, and JOY and other co-conspirators, directly and through various co-promoters, including LEWIS and SMITH, promoted, marketed, and sold the SCE Tax Shelters to the participants—high income taxpayers. To become a member in the Tax Shelter partnership, each participant was required to complete and sign a subscription agreement and purchase units in the Tax Shelter that were typically offered for $25,000 per unit. FISHER, SINNOTT, and JOY and other co-conspirators structured the Tax Shelter to guarantee at least a 4:1 tax deduction ratio for each participant. In other words, for every unit a participant purchased in the Tax Shelter, the participant could expect to receive a charitable tax deduction totaling at least four times the amount the participant paid for the units.

d. Using the typical 4:1 ratio, for every $100,000 of units purchased by a participant, the participant received a non-cash charitable contribution tax deduction of approximately $400,000 on their income tax return. As explained in the marketing material for one of the 2019 Tax Shelters, a participant who contributed $100,000 to the scheme could receive nearly $170,000 back within months of purchasing their units depending on his or her tax rate by claiming a $400,000 deduction.

e.  At the end of each calendar year, which was also the end of the tax year for the participants, the conspirators typically requested the participants to vote on options for the land: (1) a "development option;" (2) a "green" or charitable donation option involving placement of a portion of the land into a conservation easement or donating the land in fee simple to a charitable organization; or (3) a "buy and hold plan."  For the SCE Tax Shelters promoted by FISHER, SINNOTT, JOY, LEWIS, SMITH, and the other co-promoters for the 2013 through 2019 tax years, the conspirators manipulated the "vote" to result in the selection of a conservation easement or a fee simple donation, which delivered the fraudulent tax deductions necessary to achieve the promised ratio to the participants.

f.  After the purported "vote," the co-conspirators caused the Property Company to either (1) place a conservation easement over a portion of the land and then donate the conservation easement to Land Conservancy 1 or Land Conservancy 2, or (2) donate the land in fee simple to a charitable organization.

g.  Tax Shelters held a portion of the land unencumbered by the conservation easement (the "residual property") in an effort to make it appear that the Tax Shelters had economic substance.  Instead, the residual property was nothing more than window-dressing that FISHER and ICM claimed might be developed or sold, when, in reality, they did not develop or sell  the residual property or distribute income to participants with respect to a development or sale of the residual property.

h. FISHER, SINNOTT, and ICM hired ROBERTS and WEIBEL to appraise the value of the conservation easement or fee simple donations at the inflated amounts FISHER, SINNOTT, and JOY needed to deliver the promised tax deduction ratio to potential participants.  The final appraisal value generated by ROBERTS and WEIBEL always substantially exceeded the amounts the Tax Shelter paid to acquire an ownership interest in the Property Company or land.

i.  ROBERTS and WEIBEL signed Forms 8283 that reported the final appraisal values of the conservation easements they had appraised.  Forms 8283 were then attached to the Property Company's federal income tax returns and filed with the IRS.  These tax returns allocated a non-cash charitable contribution tax

deduction to the Tax Shelter, which then passed the deductions through to the Tax Shelter's participants on a Schedule K-1. The participant would then report that flow-through charitable contribution deduction on his or her individual income tax return as a tax deduction, substantially reducing his or her tax liability.

41. To generate the fraudulent tax deductions and enrich themselves, FISHER, SINNOTT, and JOY and other co-conspirators, among other things: (1) generated misleading marketing and promotional material to falsely give the transactions the appearance of economic substance and business purpose, when they did not; (2) obtained grossly inflated appraisals; (3) donated the easement to a land conservancy or land to a non-profit organization; (4) backdated subscription agreements and other investment-related documents; (5) instructed participants who had purchased units after the tax year ended to backdate subscription agreements and check payments; and (6) prepared and filed and caused to be prepared and filed false and fraudulent federal income tax returns that were signed under penalties of perjury, and other false tax documents that were filed with the IRS.

*Fraud in the Design and Marketing of the SCE Tax Shelters*

42. FISHER, SINNOTT, and JOY organized and marketed the SCE Tax Shelters in a manner designed to conceal the true fraudulent nature of the Tax Shelters and to impede and obstruct the ability of the IRS to detect the fraudulent nature of the transactions, including in the following ways:

a. FISHER, SINNOTT, and JOY created marketing materials, including a private placement memorandum ("PPM"), for each of the SCE Tax Shelters to give the SCE Tax Shelters the appearance of legitimate investments with a true business purpose when, in reality, the Tax Shelters existed only as a vehicle to sell tax deductions. The marketing materials were provided to potential participants as well as financial advisors, accountants, and attorneys who served as co-promoters for FISHER, SINNOTT, and JOY, including LEWIS and SMITH.

As FISHER explained to an undercover agent posing as a potential promoter ("UCA-1") during a recorded call on November 9, 2018, FISHER and his

co-conspirators purposefully disguised the abusive tax shelters as real estate investments in case the IRS audited any of the deals:

> FISHER: We know that if we're examined by the [IRS] they will ask for all promotion materials, so you have to be very, very careful that these look like real estate investments, you know, as compared to, you know, basically a tax shelter.

b. FISHER, SINNOTT, and JOY further intended for the marketing materials to appear like a real estate investment to influence how participants and others described the scheme. For example, in a November 15, 2018, meeting with UCA-1, FISHER emphasized the language he desired participants to use in characterizing the transaction:

> FISHER: If somebody called up somebody and—not that they'd ever do this—we don't want somebody to say, 'yeah, that's the tax shelter I invested in.' We want them to say 'that's the piece of real estate I invested in.'

SINNOTT further explained during that same meeting that the marketing material and paperwork were optics, designed to fool the IRS and the Tax Court:

> SINNOTT: So, I mean, it's up to them to be there, but the optics matter, you know, because ultimately this is going to get sent—you know, you assume it's going to sit in front of a tax court judge, right? . . . And the tax court judge is going to have our pile of development materials like this.

43.   FISHER, SINNOTT, and JOY further impeded and obstructed the ability of the IRS to detect the fraudulent nature of the transactions by holding a "vote" each year in an effort to make it appear as if the Tax Shelters were controlled by the participants and that the Tax Shelter was an investment that included the possibility of actual development, as explained below:

a. FISHER, SINNOTT, and JOY generated marketing materials that advertised voting "choices" for the Tax Shelter.

b. When a participant failed to submit a vote, the vote was automatically deemed to be for the "recommendation" of the "manager" for the Tax Shelter. Whenever the conservation easement option was a voting option, this was always the manager's recommendation.

c. In other words, FISHER, SINNOTT, and JOY made sure the vote always resulted in the Tax Shelter donating a conservation easement.   As SINNOTT explained in the November 15, 2018, meeting with UCA-1, the vote was guaranteed to be for the conservation easement:

UCA-1:  And then what if you get some boneheads in this group that vote to go—

SINNOTT: - It's not going to happen.

. . .

UCA:  Okay.  Everybody's on board though?

SINNOTT:  Everyone's on board, yeah.

UCA:  There we go.

SINNOTT:  Everyone's on board.  Not an issue.  If we have a development fund, it'll be a development fund and we'll make it very clear that people are investing in a development fund and they're not going to get an instant – you know, instant 80 percent on their investment. They're going to get it more traditionally.

UCA: Yes, okay

. . .

> SINNOTT:   We're like dumb ass, this is how many times
> that we've told you this same basic format, you know.
> But that also tells us we're doing our job right because
> it's all optics.

44.     Contrary to the language in the PPM suggesting the land might be developed, FISHER, SINNOTT, JOY, LEWIS, and SMITH promoted the Tax Shelters to participants as a tax savings vehicle.  The conspirators provided a tax deductions ratio long before a final appraisal for the easement was ever completed and often before formal marketing materials were even completed and available to participants.

*Fraud in the Appraisals*

45.     To facilitate the scheme, ROBERTS and WEIBEL, with the assistance of FISHER, SINNOTT, and JOY, created grossly inflated appraisals that valued the conservation easements or land at multiples of the price paid to acquire an ownership interest in the Property Company that held the land.

46.     FISHER, SINNOTT, and JOY typically provided the tax deduction ratio for the SCE Tax Shelters to LEWIS and SMITH and the other co-promoters around the time the SCE Tax Shelters were initially marketed so that the co-promoters could begin selling units in the Tax Shelters to participants using that tax deduction ratio.

a.  The tax deduction ratio was correlated to the anticipated appraised value of the easement.  FISHER, SINNOTT, JOY, LEWIS, and SMITH could guarantee the tax deduction ratio for each Tax Shelter early in the year because FISHER and SINNOTT pre-determined the value of the easement before any appraisal was performed.  Indeed, many of FISHER's promotional and marketing materials informed participants of the value of the tax deduction before the easements were appraised.

15

b. FISHER, SINNOTT, and JOY knew that ROBERTS and WEIBEL would "appraise" the easements at the value necessary to achieve the desired tax deductions ratio. Indeed, for the Tax Shelters that LEWIS and SMITH sold, the final tax deduction ratio based on the final "appraisal" generated by ROBERTS or WEIBEL nearly always matched the tax deduction ratio the conspirators used to market the Tax Shelters.

47.    FISHER, SINNOTT, and other co-conspirators ensured that the valuations of the conservation easements would be so high that, even if an IRS audit disallowed a percentage of the valuation, the participants would still receive a tax benefit exceeding the amount they paid into the Tax Shelters.

a. In many of the marketing materials FISHER, SINNOTT, and JOY used to sell SCE Tax Shelters, FISHER, SINNOTT, and JOY provided hypothetical examples of how much tax a participant could avoid paying based on the amount of units in the Tax Shelter a participant purchased. These marketing materials assured that, even in the event of an "IRS Examination" resulting in an adjustment, the participants' purchased tax benefit would still exceed the purchase price of the Tax Shelter units they bought.

b. During a recorded call on November 9, 2018, FISHER explained to UCA-1 that he and other co-conspirators specifically set the tax deduction ratio to account for the possibility of an IRS audit resulting in an adjustment to the deduction. FISHER explained that he and his team set the ratio so that if the IRS adjusted the deduction amounts, "people can still get a good return on their money."

c. During a recorded meeting with Individuals A and B, FISHER admitted that he and other co-conspirators purposefully obtained fraudulent appraisals that overinflated the values of the land by at least 30% to build in a cushion for participants to still receive a financial benefit from the Tax Shelter even if the IRS audited the transaction:

FISHER: I mean when you get down to it, these appraisals are all about 30% higher than they should be, but you just know that the IRS is gonna come in and whatever you put, if we'd said "$500[,000]," they would've said "20% off $500[,000]." . . . You just go to the high end of like 'Well, okay, I must have been smoking something good but,' you know.

48.     FISHER and SINNOTT used hand-picked appraisers, WEIBEL and ROBERTS to complete the appraisals in the scheme. FISHER and SINNOTT knew that ROBERTS and WEIBEL would generate fraudulent appraisals of the conservation easements needed to achieve the tax deduction ratio promised to the participants. In a meeting with UCA-1 on November 15, 2018, FISHER and SINNOTT acknowledged the significant role the appraisals played in the scheme and admitted that they provided the information to ROBERTS and WEIBEL to be included in the appraisals:

UCA: Do you have like an appraiser that does all of them so that you know that they're going to . . .

SINNOTT: Yeah.

UCA: Like the same one who does . . .

SINNOTT: Uh-huh (affirmative)

UCA: Okay, all right.

FISHER: Pretty much – your appraisal really is the business plan. I mean, we really do the business plan and we give it to the appraisers. They check out, you know, the comps and stuff like that. But really before we actually close on something we – we have within a probably 10%, 20% range we know what the appraisal's

> going to be.  We have to figure that out before we buy the
> property.

As FISHER once described during a recorded meeting with Individual A and
Individual A's colleague, ROBERTS simply "puts down whatever we say."

49.　Instead of conducting an independent appraisal, ROBERTS and
WEIBEL relied upon FISHER, SINNOTT, and other co-conspirators to provide the
final appraisal values that ROBERTS and WEIBEL were expected to achieve, as
well as the purported supporting documentation and analysis to arrive at those
values.  As FISHER summarized during the November 15, 2018, meeting with
UCA-1: "We basically have to provide a road map for the appraisers. . . . You got
to provide everything."

a.  For example, FISHER, SINNOTT, and JOY and other co-conspirators
routinely provided ROBERTS and WEIBEL with spreadsheets that contained
information purportedly used to value the conservation easements.  At times, the
spreadsheets contained a section that set forth the conservation easement
deduction valuation that the co-conspirators needed the appraisers to achieve.

b.  WEIBEL and ROBERTS then included identical or nearly identical
inputs from the spreadsheets in the final appraisals.

50.　In their final appraisals for each of the conservation easements and
fee simple donations, ROBERTS and WEIBEL deliberately took steps to obscure
and conceal the inflated nature of the appraisals from the IRS.  ROBERTS and
WEIBEL provided appraisals that fraudulently inflated the valuation of the
donated conservation easements by omitting key facts about the land and using
false and misleading information, including the following:

a.  Intentionally disregarding recent and relevant comparable listings
and recent sales that, when considered, dramatically lower the ultimate valuation;

b.  Intentionally disregarding prior sales of the land or of the Property
Company;

18

c. Intentionally disregarding prior unsuccessful attempts to develop the land for the same "highest and best use" as set forth in the appraisals;

d. Intentionally misrepresenting descriptions of the land (e.g., failed to disclose that the property was located in a marsh or on extremely steep and mountainous terrain);

e. Intentionally misrepresenting the applicable zoning of the land, such as claiming the property had approved zoning for higher density than that which was actually approved; and

f. Intentionally misrepresenting the actual condition of the land, such as stating the property had existing ingress, egress, or other infrastructure that did not exist.

51.    ROBERTS manipulated his appraisal values to increase the appraisal number at FISHER's request to accommodate Tax Shelters that over sold units (i.e. sold units to too many participants.)

a.    The tax deduction ratios promoted to participants were based on the sale of a set number of units in the Tax Shelter.  If more units of the Tax Shelter were actually sold (i.e., the Tax Shelter was oversubscribed), then the participants' "return" would be diluted and they would each receive a lower tax deduction ratio than promised.  To solve this problem, the conspirators caused the appraisal value to increase to accommodate more participants.

b. In one Tax Shelter, ROBERTS inflated his appraisal value after the close of the tax year by over $2 million, as directed by the conspirators, because the conspirators were able to sell more units in the Tax Shelter than anticipated, i.e., an oversubscription of units.  In another Tax Shelter, ROBERTS increased his valuation of the conservation easement after the close of the tax year by over $3.5 million based, in part, on JOY's request to increase numbers in his analysis by 10%.

52.     FISHER, SINNOTT, and other co-conspirators concealed and obscured from the IRS the fact that the alleged dramatic increases in value took place over a short period of time by "tacking" their holding period to the prior landowner's and then including the original landowner's date of acquisition of the property on the IRS Form 8283 that was submitted to the IRS.

53.     ROBERTS and WEIBEL frequently intentionally omitted from their appraisals that the Property Companies holding the land were sold for a fraction of the supposed value of the conservation easement often within months of the date of their appraisal.  As shown below, ROBERTS and WEIBEL consistently reported values for the conservation easements that were substantially higher – and in fact frequently at least 10 times higher – than the amount the co-conspirators had paid to purchase their interest in the Property Companies, often within months before or after the final appraisal was generated, for example:

| Property Company (shorthand defined below) | Date of Purchase (on or about) | Appraisal Date (on or about) | Approx. Purchase Price | Conservation Easement Valuation |
|---|---|---|---|---|
| Ft. Myers | Dec. 2013 | Nov. 30, 2013 | $6,350,000 | $66,214,000 |
| Thompson Mountain | Dec. 1, 2014 | Feb. 26, 2015 | $2,400,000 | $24,240,000 |
| Inland Bluffton | Dec. 22, 2014 | Nov. 25, 2014 | $3,500,000 | $41,535,000 |
| Jenny's Lane | Aug. 1, 2015 | Jan. 13, 2016 | $1,000,000 | $11,000,000 |
| NC Whisper Mountain | Apr. 21, 2014 | Mar. 6, 2016 | $1,350,000 | $13,510,000 |
| Sand Investment | Oct. 2015 | Jan. 4, 2016 | $6,000,000 | $80,150,000 |
| Chestatee | Nov. 30, 2015 | Mar. 15, 2016 | $1,500,000 | $36,020,000 |
| Old Paris Landing | Dec. 18, 2015 | Jan. 6, 2017 | $1,400,000 | $15,146,000 |
| Crimson Independence | Dec. 2015 | Dec. 30, 2016 | $13,799,394 | $179,760,000 |
| Hillside Holdings | Apr. 1, 2016 | Dec. 30, 2016 | $2,400,175 | $44,425,000 |
| Nautical Hill | Dec. 28, 2015 | Dec. 28, 2016 | $1,100,000 | $30,330,000 |
| Sandlapper | Dec. 28, 2016 | Jan. 18, 2018 | $2,200,000 | $24,420,000 |
| Argent TH A | Dec. 1, 2017 | Dec. 8, 2017 | $1,000,000 | $10,060,000 |
| Figure 8 (Georgia) | Nov. 22, 2016 | Jan. 20, 2018 | $9,390,818 | $96,810,000 |
| Figure 8 (Highlands) | Aug. 2, 2017 | Feb. 15, 2018 | $12,000,000 | $182,500,000 |
| Storm Crow | May 19, 2018 | Feb. 11, 2019 | $4,200,000 | $85,180,000 |
| Equity Investment | Oct. 3, 2018 | Apr. 1, 2019 | $12,000,000 | $223,050,000 |
| Winnemucca | Nov. 22, 2017 | Feb. 27, 2018 | $3,092,800 | $51,980,000 |

*Land Conservancy 1*

54.     FISHER maintained a close relationship with Land Conservancy 1 which he knew would accept the Tax Shelters' conservation easement donations.

55.     In or around July 2002, Director 1, a co-conspirator known to the Grand Jury, assisted with creating Land Conservancy 1, which promptly accepted a conservation easement donation related to FISHER's first Tax Shelter.  Director 1 was a CPA who previously worked with FISHER at Accounting Firm 1 until the early 2000s.  Director 1 served as the Executive Director of Land Conservancy 1 and was responsible for, among other things, the day-to-day management of Land Conservancy 1, including the consideration, approval, and administration of any conservation easement.

56.     Land Conservancy 1 maintained a Board of Directors, the majority of whom had ties to FISHER.  In practice, the Board of Directors acted as a rubber stamp for Director 1's actions.

*Fraud in the Documentation of Participation in the Shelters: Backdating*

57.     At times, the predetermined number of available units in the Tax Shelters had not sold out by the end of the tax year (the "Undersubscribed Tax Shelters").  At other times, the promoters sold too many units in a Tax Shelter (the "Oversubscribed Tax Shelters").

58.     As FISHER, SINNOTT, JOY, LEWIS, SMITH, and their conspirators knew, a taxpayer cannot claim a tax deduction based on a partnership's charitable contributions in a given tax year if the taxpayer was not a partner during that tax year. As FISHER explained to UCA-1 in the November 15, 2018, meeting:

> FISHER:     See, the law says that you spread the conservation deduction, you spread it on the day you make the easement.

UCA: Okay.

FISHER: It would be the same concept. Let's say you bought into a partnership and the partnership is going to sell some land and it's going to close in December 31. It's distributed to whoever is a partner on December 31. So that's how the partnership rules work.

59. To make more money from the Tax Shelters, FISHER, SINNOTT, JOY, LEWIS, SMITH, and their conspirators continued to sell leftover units in Undersubscribed Tax Shelters after the tax year ended. Likewise, to make more money from the Tax Shelters, FISHER, SINNOTT, and JOY "moved" participants from Oversubscribed Tax Shelters to Undersubscribed Tax Shelters after the conclusion of the tax year.

60. FISHER, SINNOTT, JOY, LEWIS, SMITH, and their conspirators backdated documents to make it appear as if the participants had timely purchased their units in the Undersubscribed Tax Shelters. FISHER, SINNOTT, JOY, LEWIS, SMITH, and other co-conspirators, including Stein and Corey Agee, used several different methods to facilitate and disguise the sale of units to participants after the close of the tax year, including:

a. For some Tax Shelters, FISHER, SINNOTT, JOY, Stein Agee, and other co-conspirators created, and caused to be created, two entities that they used to hold and sell units in a Tax Shelter after the close of the tax year.

b. For other Tax Shelters, FISHER, SINNOTT, and JOY, Stein Agee, and other co-conspirators allocated unsold Tax Shelter units to a placeholder participant in their internal books named "LTS." "LTS" was an acronym for "Left To Sell," and the "LTS" entry on the books represented units of the Tax Shelter that the co-conspirators still had left to sell to participants after the close of the relevant tax year. By allocating the LTS units on the books to a placeholder participant, FISHER, JOY, Stein Agee, and other co-conspirators were able to issue the Schedules K-1 (for clients who already purchased units in the SCE Tax Shelter) to be distributed timely to the participants without disrupting the partnership

allocations. Later, after the units allocated to LTS were sold, additional Schedules K-1 were issued to the late-joining participants.

c. Frequently, FISHER, SINNOTT, JOY, Stein Agee, Corey Agee, LEWIS and SMITH, and other co-conspirators, backdated, and caused to be backdated, subscription agreements, checks, and other documents related to the Tax Shelters to make it appear that participants had purchased their units before the close of the preceding tax year and before the conservation easement was donated.

d. On other occasions, FISHER, SINNOTT, JOY, Stein Agee, Corey Agee, LEWIS and SMITH, and other co-conspirators used purported "promissory notes" to attempt to cover up the late sales.

61.    With the assistance of FISHER, SINNOTT, JOY, LEWIS, SMITH, and their co-conspirators, participants fraudulently claimed charitable deductions on their income tax returns related to the Tax Shelters for years in which they were not members of the Tax Shelter partnerships.

*Causing the Preparation of False and Fraudulent Income Tax Returns*

62.    Both before and after the relevant tax year closed, FISHER, SINNOTT, and JOY, ROBERTS, and WEIBEL assisted Stein Agee and Accounting Firm 1, and others, in preparing false and fraudulent partnership returns for each of the SCE Tax Shelters, claiming deductions to which the partnerships were not entitled.

63.    FISHER, SINNOTT, JOY, LEWIS, SMITH, and other co-conspirators caused Stein Agee and Accounting Firm 1 to prepare Schedules K-1 that were filed with the IRS and issued to each of the participants that reported a non-cash charitable contribution tax deduction based on the conservation easement or land donations.

64.    For the tax years 2013 through 2019, LEWIS and SMITH prepared and filed, and caused to be prepared and filed, false individual income tax returns for the participants that claimed false tax deductions generated by the Tax Shelters.

*Additional Attempts to Deceive and Impede the IRS*

65.     When the IRS examined the Tax Shelters and individual partners, FISHER wanted Stein Agee to control the flow of documents to the IRS. Accordingly, when participants contacted FISHER about the IRS's examination of their individual tax returns, FISHER urged them to use Stein Agee and Accounting Firm 1 to handle their interactions with the IRS.

66.     FISHER and Stein Agee agreed to attempt to delay the IRS audits until after the statute of limitations relating to the conservation easement deductions had expired.  For example:

    a.  In mid-2018, Individual A and Individual B requested assistance from FISHER in responding to an IRS audit of Individual B's tax returns.  The IRS included a request for documentation relating to conservation easement deductions Individual B had claimed on his return.  FISHER enlisted Stein Agee and Accounting Firm 1 to assist Individual B.  FISHER knew that documents related to the donation of the conservation easement had never been executed and requested that Stein Agee attempt to delay the IRS past the statute of limitations date for initiating an audit of the conservation easement transactions themselves.

    b.  FISHER informed Individuals A and B that they would need to backdate certain documents to make the conservation easement transactions look legitimate for the IRS.  Having been informed by Individual A that the IRS had requested copies of the purchase and sale agreements and other documents related to the Tax Shelters, FISHER advised Individuals A and B during a recorded call that "[t]hese agreements need to match the tax returns, whatever was actually filed."

    c.  On behalf of FISHER, Attorney A provided the relevant documents to Individual B to sign and backdate.

*Financial Benefits from the Fraudulent Scheme*

67.    FISHER, SINNOTT and JOY benefited financially from the fraudulent scheme, frequently in the form of fees paid from the Tax Shelters.  In aggregate, FISHER, SINNOTT, and JOY earned the following approximate amounts generated by the fraudulent scheme during tax years 2013 through 2020:

| Individual | Approximate Amount |
|---|---|
| JACK FISHER | $60,000,000 |
| JAMES SINNOTT | $6,000,000 |
| KATE JOY | $1,000,000 |

68.    FISHER used money generated by the sale of units in the Tax Shelters to purchase personal assets including real estate for himself and co-conspirators, vacation homes, luxury vehicles, and other personal items.  For example, FISHER used money paid by the Tax Shelter participants, directly and indirectly, to purchase the following:

| Asset | Approximate Amount |
|---|---|
| Arbor Hill property located in Georgia | $4,400,000 |
| New Hampstead property located in Georgia | $6,800,000 |
| Luxury King Aire Recreational Vehicle and Trailer | $450,000 |
| Mercedes GLS 550 4Matic | $101,971 |
| Down payment for luxury condominium in Asheville, North Carolina | $270,000 |
| Vacation home in Bonaire in the Caribbean Islands | $2,000,000 |
| Model EA 500 airplane | $959,000 |
| Residential home in Reno, Nevada | $1,000,000 |
| Show Jumping Horse | $750,000 |
| Super Bowl LIII Hall of Fame Experience | $255,000 |
| Residential home plus renovations in Roswell, Georgia for a family member | $1,000,000 |
| Residential home in South Carolina | $305,000 |
| Home in Markleeville, CA | $925,000 |

69.    FISHER, SINNOTT, and JOY paid significant commissions to the co-promoters who sold the SCE Tax Shelters.  These commissions consisted of a percentage of the amount of capital the promoters raised from selling units to participants.

a. Since 2014, FISHER and ICM paid the various co-promoters at least $20 million.  Most of the individuals that earned commissions were conspirator CPAs.

b. During the November 15, 2018, meeting with UCA-1, FISHER acknowledged the key role the co-promoters played in promoting the scheme and selling units in the Tax Shelters:

> FISHER: [T]he way we work primarily is with CPA firms, because most everybody ends up going to their CPA anyway. . . . So what we found, no matter how well somebody likes it, if their CPA says no, you know, it doesn't work.  And then we have – we started back in '13 or '14 basically paying the CPA's referral fees.  You'd be amazed at how our business increased.

70.    Since 2014, FISHER, SINNOTT, and ICM paid more than $10 million to other service providers, such as appraisers, real estate advisors and brokers, land planners, engineers, developers, accountants, and attorneys, for assisting in organizing and promoting the Tax Shelters and creating the "optics" to paper the files. ROBERTS and WEIBEL earned the following for their role in the fraudulent scheme:

| Appraiser | Years | Approximate Payments |
|---|---|---|
| Roberts | 2013-2019 | $227,324 |
| Weibel | 2015-2019 | $335,000 |
| **Total:** | **2013-2019** | **$562,325** |

71.   Additionally, FISHER, SINNOTT, and JOY gave "friends and family units" in the various Tax Shelters to some co-promoters, co-conspirators, and other individuals.

a. The recipients of "friends and family units" did not pay for them. These units were typically provided as a payment for services or to compensate participants for audit adjustments in prior Tax Shelters.

b.   FISHER admitted during a recorded call with Individuals A and B to giving units to the partners at Accounting Firm 3 to reward them for their willingness to backdate transactions and to improperly sell units after the end of the tax year:

> FISHER: So, what I'm doing is going back and . . . the reason I gave them in friends and family is . . . they participated in basically backdating all the documents.

72.   To conceal the fact that ICM was paying commissions to the co-promoters who were selling the Tax Shelters to their clients, FISHER, SINNOTT, and JOY instructed the co-promoters to submit invoices to ICM describing the commissions with labels such as "due diligence fees," "consulting fees," and "tax return preparation fees."

73.   FISHER, SINNOTT, and ICM paid LEWIS and SMITH nearly $1.5 million based on their sales of units in the various SCE Tax Shelters as follows:

| Co-Promoter | Years | Total Commissions |
|---|---|---|
| Lewis | 2015-2020 | $1,005,900 |
| Smith | 2015-2020 | $491,400 |
| **Total:** | **2014-2020** | **$1,497,300** |

74.   In addition to organizing, designing, marketing, implementing, and selling the SCE Tax Shelters, FISHER, SINNOTT, and JOY, claimed the same fraudulent non-cash charitable contribution deductions generated by the Tax

Shelters on their own individual income tax returns that they signed under the penalties of perjury and filed with the IRS, which reduced their own substantial income tax liabilities largely generated by the promotion and sale of these Tax Shelters.

Overt Acts

75.     To accomplish the object of the conspiracy, the defendants, and others known and unknown to the Grand Jury, committed and caused to be committed the acts identified in Paragraph one through 74 of this Superseding Indictment as well as the following overt acts, among others, in the Northern District of Georgia and elsewhere:

**The Early SCE Tax Shelters**

76.     Beginning in at least in or around 2002, FISHER, through an entity known as Renaissance Ventures, began "working on techniques to monetize the value of conservations deductions." In certain promotional material, FISHER explained that he monetized the deductions by "using limited liability partnerships to acquire the land and place conservation easements on the property with the tax benefit going to investment partners."

77.     In or around 2002, Director 1, a co-conspirator, assisted in creating Land Conservancy 1, which accepted conservation easements related to FISHER's Tax Shelters.

78.     In or around 2005, FISHER hired Appraisal Firm 1 and ROBERTS to generate appraisals for the SCE Tax Shelters.

79.     Between 2002 and 2012, FISHER and other co-conspirators organized, promoted, and sold at least 12 SCE Tax Shelters identified below:

| Tax Year | Tax Shelter | Approximate Deduction Amount |
|---|---|---|
| 2002 | Little Pine, LLC | $2,451,400 |

| Tax Year | Tax Shelter | Approximate Deduction Amount |
|---|---|---|
| 2004 | French Broad Investors, LLC | $5,290,000 |
| 2005 | Little Pine Phase III Conservation, LLC | $3,255,000 |
| 2005 | Little Pine Conservation Partners, LLC | $2,679,000 |
| 2006 | WNC Conservation, LLC | $7,700,000 |
| 2007 | NC Conservation, LLC | $14,500,000 |
| 2008 | Robinson Laurel | $9,740,000 |
| 2009 | Robinson Laurel | $7,990,000 |
| 2010 | Robinson Laurel | $6,550,000 |
| 2010 | High Mountain Meadow Investors, LLC | $7,790,000 |
| 2011 | Inland Capital Investment Fund, LLC | $9,682,472 |
| 2012 | Inland Capital Investment Fund, II | $13,953,060 |

## 2013 AND THE 2013 SHELTER

### *Inland Capital Investment Fund 2013*

80.     On or about July 3, 2013, FISHER, SINNOTT, and other co-conspirators organized and caused to be organized Inland Capital Investment Fund III, LLC and then changed the name to Inland Capital Investment Fund 2013 ("ICIF 2013"). ICIF 2013 purportedly purchased approximately a 98% ownership interest in Ft. Myers Limited Partnership ("Ft. Myers"), which owned land located within Buncombe County, North Carolina and Haywood County, North Carolina.

81.     On or about December 30, 2013, FISHER, SINNOTT, and JOY caused Ft. Myers to donate a conservation easement over a portion of the land to Land Conservancy 1.

82.     On or about June 26, 2013, FISHER sent an introductory email to a third-party and described his business and anticipated plans for Ft. Myers:

> My name is Jack Fisher . . . . I have two communities in Western North Carolina called The Preserve at Little Pine and French Broad Crossing.   They are low density

29

conservation themed communities an [sic] we have
survived the great recession intact but wounded.

My primary focus is placing conservation easements on
land and making the tax benefits available to
investors. . . .

We are looking at placing a large conservation easement
on a 400 acre piece of property in Candler NC . . . . My
interest is in coming up with the highest and best use for
purposes of a conservation appraisal. . . .

We would like to talk with you about a demographic
study which we will need to support our appraisal.

83.    By letter dated October 17, 2013, ROBERTS performed a "preliminary
valuation" for Ft. Myers and appraised the anticipated conservation easement at
$55,450,000.

84.    On or about November 18, 2013, FISHER sent ROBERTS an email
with an excel spreadsheet attached that included an appraisal analysis for Ft.
Myers.  The excel spreadsheet listed the "Conservation Easement Value" at
$65,740,915.  The excel spreadsheet also stated that the participants would receive
an aggregate of $29,977,857 in exchange for their total capital raise of $15,652,599,
which meant that the participants could nearly double their money by purchasing
their units in the Tax Shelter.

85.    By appraisal report dated November 30, 2013, ROBERTS appraised
Ft. Myers's conservation easement donation to be worth $66,214,000.

### Organizing, Marketing, and Selling Units in the Tax Shelters

86.    During 2013, FISHER, SINNOTT, and JOY, Stein and Corey Agee, and
other unnamed co-conspirators, promoted and sold units in ICIF 2013 to high-
income participants.

87.    By the end of 2013, FISHER, SINNOTT, and JOY had not sold all the available units in ICIF 2013.  In or around early December 2013, FISHER, SINNOTT, and Stein Agee met to discuss how best to facilitate the sale of the unsold units after the tax year ended.  During the meeting, they agreed to establish Green Fields Investments, LLC, and allocate a portion of the unsold units in ICIF 2013 to that entity to disguise the ongoing sale of units after the close of the 2013 tax year.

88.    On or about December 28, 2013, FISHER, SINNOTT, and other co-conspirators organized, and caused to be organized, Green Fields Investments, LLC ("Green Fields") in the state of North Carolina.

89.    In or about April 2014, FISHER and Stein Agee opened and caused to be opened a bank account held in the name of Green Fields.

90.    On or about December 30, 2013, FISHER and SINNOTT organized, and caused to be organized, Petite Pines Holdings, LLC ("Petite Pines") in North Carolina.  Petite Pines held a 4.372% ownership interest in ICIF 2013.

91.    In 2014, FISHER, Stein and Corey Agee, and other co-conspirators sold units in ICIF 2013 through Green Fields and Petite Pines, and backdated documents to make it appear as if the sales occurred in 2013.

92.    On or about April 3, 2014, JOY provided a co-promoter with a subscription agreement, explaining, "[p]lease find enclosed subscription agreement for your 4 units in Inland Capital Investment Fund 2013, LLC, as well as counter page of operating agreement executed by Jack Fisher, the Manager of the Fund." JOY directed the co-promoter to "execute the copies, keep one for your records and send one back to us." The attached subscription agreement was pre-filled and backdated with a date of December 30, 2013.

93.    On May 11, 2014, Agee emailed FISHER a copy of a client's signed and backdated subscription agreement for Green Fields that was backdated to December 28, 2013.

94.   On or about September 16, 2014, FISHER sent a co-promoter a subscription agreement for Petite Pines and directed he sign it and send back to FISHER. The subscription agreement was pre-filled and backdated with the date December 31, 2013.

95.   In 2014, FISHER, Stein Agee, and other co-conspirators also arranged for certain participants whose deductions were reduced as a result of an IRS audit of a prior SCE Tax Shelter to receive free units in ICIF 2013 through Green Fields after the close of the 2013 tax year.

96.   On or around September 16, 2014, FISHER, SINNOTT, ROBERTS, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income, for Ft. Myers that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution deduction in the amount of $66,214,000 based on the donation of a conservation easement.

97.   On or about September 11, 2014, FISHER, SINNOTT and Stein Agee prepared and filed, and caused to be prepared and filed, a false and fraudulent Form 1065, U.S. Return of Partnership Income, for ICIF 2013 that fraudulently claimed a flow-through conservation easement donation deduction from Ft. Myers in the amount of $60,535,658.

## 2014 AND THE 2014 SHELTERS

### *Inland Capital Investment Fund 2014*

98.   On or about July 3, 2013, FISHER, SINNOTT, and other co-conspirators organized and caused to be organized Inland Capital Investment Fund IV, LLC and then a few weeks later, changed the name to Inland Capital Investment 2014 ("ICIF 2014"). ICIF 2014 purchased, through an intermediary entity, approximately an 87% ownership interest in Inland Bluffton, LLC ("Inland Bluffton") which owned land in Beaufort County, South Carolina.

99.    On or about December 31, 2014, FISHER, SINNOTT, and JOY caused Inland Bluffton to donate a conservation easement on a portion of the land to Land Conservancy 1.

100.    On or about September 20, 2014, FISHER sent an email to ROBERTS that provided the conservation easement valuation FISHER needed ROBERTS to achieve for Inland Bluffton, stating, "I have come up with the value at around $30 million." The attachments to FISHER's email included a spreadsheet that provided the numbers for ROBERTS to use in his "analysis" for valuing the conservation easement for Inland Bluffton as well as a valuation of the conservation easement tax deduction of $29,802,368.

101.    By letter from ROBERTS to FISHER dated November 17, 2014, ROBERTS initially valued the conservation easement for Inland Bluffton at $29,365,000.

102.    On or about December 3, 2014, JOY sent ROBERTS an email with the subject line "Bluffton – Jack's comments" and an attachment called "Bluffton – Appraisal Report Draft – Kate's comments- 12.01.2014." The attachment was a 48-page draft appraisal of the conservation easement for Inland Bluffton prepared by ROBERTS that valued the conservation easement at $29,578,000.

103.    On or about December 9, 2014, JOY sent ROBERTS an email stating, "Please see attached comments on the Appraisal of Bluffton property. Jack will call to discuss." The email included an attachment called "Inland Appraisal Draft" which was a 50-page draft appraisal of the conservation easement for Inland Bluffton by ROBERTS that valued the conservation easement at $38,018,000.

104.    On December 31, 2014, SINNOTT sent an email with a copy to JOY and FISHER stating that "both of our 2014 Funds are closed out and were in fact oversubscribed with a total raise of over $14M." By letter dated September 29, 2015, FISHER similarly told the "Investors of Inland Capital Investment Funds" that ICIF 2014 was "oversubscribed."

105.   On or about February 6, 2015, JOY sent an email to ROBERTS and attached updated numbers for ROBERTS to use in his appraisal for Inland Bluffton, stating: "Please see our calculations with a 10% increase in prices per acre. The 'Before' is a little messy, since I kept the old numbers to compare." The spreadsheets attached to JOY's emails increased the purported appraised value of Inland Bluffton's conservation easement by over $3.5 million to approximately $41.5 million.

106.   ROBERTS's final appraisal report, purportedly dated November 25, 2014, appraised Inland Bluffton's conservation easement donation to be worth $41,535,000.

107.   ICIF 2014 also purchased a 98% ownership interest in Mountaintop Property Investments, LLC ("Mountaintop"), which owned land in Marshall, North Carolina.

108.   On or about December 31, 2014, Mountaintop donated the land to a non-profit organization.

109.   According to the appraisal report dated March 29, 2015, ROBERTS appraised Mountaintop's donation to be worth $3,988,000.

110.   ICIF 2014 also purchased approximately a 98% ownership interest in River Club Holdings, LLC ("River Club"), which owned land in Marshall, North Carolina.

111.   On or about December 31, 2014, River Club Holdings donated the land to Land Conservancy 1.

112.   According to the appraisal report dated March 30, 2015, ROBERTS appraised River Club's donation to be worth $2,461,000.

34

*Southern Appalachian Investment Fund 2014*

113.   On or about October 30, 2014, FISHER, SINNOTT, and other co-conspirators organized and caused to be organized Southern Appalachian Investment Fund 2014 ("SAIF 2014").   SAIF 2014 purportedly purchased approximately a 97% ownership interest in Thompson Mountain Holdings, LLC ("Thompson Mountain"), which owned land located in Western North Carolina.

114.   On or about December 31, 2014, FISHER, SINNOTT, and JOY caused Thompson Mountain to donate a conservation easement on a portion of the land to Land Conservancy 1.

115.   On or about October 24, 2014, FISHER sent an email to ROBERTS, stating "Final plan for Thompson Mountain Holdings."   The attachment to FISHER's email included a spreadsheet that provided the numbers for ROBERTS to use in his "analysis" for valuing the conservation easement for Thompson Mountain.

116.   On December 4, 2014, JOY sent an email to a prospective participant with a copy to a co-promoter that attached "the most recent documentation" for SAIF 2014.   The email attached, among other documents, a copy of a draft appraisal by ROBERTS and an appraisal summary.   The draft appraisal, dated November 24, 2014, valued the conservation easement for Thompson Mountain at $22,184,000.   Similarly, an appraisal summary from FISHER dated December 5, 2014, listed the "Value of Conservation Deduction" as $22,184,000.

117.   On or about December 24, 2014, JOY sent by email a voting ballot to participants in SAIF 2014.   The voting ballot stated: "[SAIF 2014] acquired a majority interest in Thompson Mountain Holdings, LLC, which purchased in December of 2013 a 223.63 acre high mountain tract . . . Granting the conservation easement would result in a potential tax deduction for [SAIF 2014's] members of approximately $22,184,000."

118.   On or around March 20, 2015, FISHER and JOY met with Individuals A and B in a recorded meeting.   During the meeting, they discussed, among other

things, issues related to Thompson Mountain. During the meeting, FISHER discussed false items in the inflated appraisal:

> FISHER: Alright, let me tell you what my biggest concern about Thompson Mountain Holdings is right now. It's being able to sustain our tax position. . . . Thompson Mountain, with the $800,000. You know the way that we did our projections, we assumed that we were gonna have basically an amenity up there, and we assumed that we were gonna have the road paved from the gate up there. I feel that that's one of my biggest concerns is making sure that we address that issue of getting the road up there.

> INDIVIDUAL B: Of at least working on it. Getting quotes. Doing something….

> FISHER: That's my biggest concern, because my overriding concern in all this is being able to not get this crammed up our ass by the Internal Revenue Service.

119. During the March 20, 2015, meeting, FISHER also discussed with Individuals A and B the Thompson Mountain appraisal and explained that he directed ROBERTS to increase the value of the appraisal to accommodate the additional money FISHER had raised from participants:

> INDIVIDUAL A: But you told us, or told me on the phone, that you were oversubscribed, which is why you were getting Terry [ROBERTS] to work on, you'd need him to relook at values.

> FISHER: And I did get it up, to be honest with you. I took it from, I got him to go to 718 as the average lot value, and that was . . . .

INDIVIDUAL B: 'Cause you were in here doing that after the first of the year, standing right there.

FISHER: But what I'm saying is, we were trying to increase the amount we could get. We were trying to increase it as much as we possibly could, 'cause this is totally unlike the previous year, we had a rush of more people that we could've sold to if we had.

120. In or about March 2015, ROBERTS increased the appraised value of Thompson Mountain by more than $2 million as directed by FISHER to accommodate the oversubscription of units.

121. By appraisal report dated February 26, 2015, ROBERTS appraised Thompson Mountain's conservation easement donation to be worth $24,240,000.

### Organizing, Marketing, and Selling Units in the Shelters

122. In 2014, FISHER, SINNOTT, JOY, LEWIS, SMITH, Stein Agee, Corey Agee, and other co-conspirators, promoted and sold units in the SCE Tax Shelters to high-income participants.

123. On or about October 31, 2014, in an email with the subject line "Conservation Easement," LEWIS promoted the SCE Tax Shelters to Client-4 and Client -5, stating,

I wanted to touch base one more time on this easement thing. It is selling quickly. I am going to be out of town Monday and Tuesday. I hope there are still some units available when I get back. I think this thing is the best safe tax savings tool I have seen in a long time; probably ever. I recommend [Client -4] putting in $25,000, which will save about $41,000 in federal and state income tax expense. . . . . I think you guys pay way too much in tax and this is a great tax break.

124.   In 2015, FISHER, SINNOTT, JOY, LEWIS, and other co-conspirators sold units in the 2014 SCE Tax Shelters to participants after the tax year ended and generated, and caused to be generated, false documents to make it appear that the participants had purchased units prior to the end of the 2014 tax year.

125.   On or about February 11, 2015, LEWIS sent an email promoting the 2014 SCE Tax Shelters to Client -4 and Client -5:

> I recommend you [Client -4] buy 2 units and [Client -5] buy 3 units.  Call me and we can go over the details but if you buy 2 units you will not owe anything at April 15th and will not need to make any estimated tax payments in 2015.

126.   On or about February 17, 2015, LEWIS emailed multiple clients about purchasing units in the 2014 SCE Tax Shelters after the tax year ended.   The email stated, "You [sic] additional units are guaranteed.  The developer [FISHER] came by my office this morning and told me that is no problem," meaning that LEWIS's clients could purchase additional units in 2015 for 2014 SCE Tax Shelters.

127.   On or about March 4, 2015, LEWIS emailed Client -4 and directed Client -4 to make payments and sign documents related to ICIF 2014 and SAIF 2014.  LEWIS wrote, "Please send payment to me along with the signed and initialed paperwork as soon as you can, which will let them [ICM] finalize the K-1s."

128.   On or about March 4, 2015, LEWIS exchanged emails with Client -3 with the subject line, "Conservation Easement" in which he explained that some of Client -3's units in ICIF 2014 had been switched to SAIF 2014.  LEWIS then asked Client -3 to sign an attached form entitled "Authorization and Instruction to Move Subscription," which stated that it authorized ICM to "convert the discussed portion of my subscription for Units in Inland Capital Investment Fund 2014, LLC (ICIF) into the equivalent Units of Southern Appalachian Investment Fund 2014, LLC (SAIF)."  This form had been pre-filled with a backdated date of "11/7/2014."

LEWIS further reminded Client -3 that he still needed to pay for some of his 2014 units.

129.   During 2015, LEWIS and other co-conspirators aided and assisted in the preparation of false and fraudulent returns for clients for tax year 2014 that fraudulently reported charitable contribution deductions based on the clients' participation in the SCE Tax Shelters, with the preparation of each such return constituting an overt act.

130.   On or around September 15, 2015, FISHER, SINNOTT, ROBERTS, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income, for Thompson Mountain that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution deduction in the amount of $24,240,000 based on the donation of a conservation easement.

131.   On or around September 15, 2015, FISHER, SINNOTT, and Stein Agee prepared and filed and caused to be prepared and filed a false Form 1065, U.S. Return of Partnership Income, for SAIF 2014 that fraudulently claimed a flow-through conservation easement donation deduction from Thompson Mountain in the amount of $23,512,800.

132.   On or around September 15, 2015, FISHER, SINNOTT, ROBERTS, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income, for River Club Holdings, LLC that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution deduction in the amount of $2,461,000 based on the donation of a conservation easement.

133.   On or around September 15, 2015, FISHER, SINNOTT, ROBERTS, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income, for Inland Bluffton, LLC that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution deduction in the amount of $41,535,000 based on the donation of a conservation easement.

134.   On or around September 15, 2015, FISHER, SINNOTT, ROBERTS, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income, for Mountaintop Property Investments, LLC that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution deduction in the amount of $3,988,000.

135.   On or around September 15, 2015, FISHER, SINNOTT, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income, for ICIF 2014 that fraudulently claimed flow-through charitable contribution tax deductions from River Club, Inland Bluffton, and Mountaintop in the amount of $42,314,832.

## 2015 AND THE 2015 TAX SHELTERS

136.   On August 11, 2015, FISHER sent WEIBEL an introductory email suggesting he would be interested in hiring WEIBEL as an appraiser:

> We are interested in expanding our network of professionals. I've enclosed a presentation we normally use for presentations so it's not self-explanatory as well as an executive summary of one of our current year offerings.
>
> The trademark of our products is economic substance in the transaction which worked well in our recent IRS tax court case.

### Inland Capital Coastal Fund

137.   On or about December 19, 2014, FISHER, SINNOTT, and other co-conspirators organized and caused to be organized Inland Capital Coastal Fund 2015, LLC and then later changed the name to Inland Capital Coastal Fund, LLC ("ICCF"). ICCF purchased, through an intermediary entity, a majority ownership

interest in Sand Investment Co., LLC ("Sand Investment"), which owned land in Jasper County, South Carolina.

138. On or about December 28, 2015, FISHER, SINNOTT, and JOY caused Sand Investment to donate a conservation easement on a portion of the land to Land Conservancy 1.

139. On November 20, 2015, FISHER sent an email to WEIBEL directing him to use certain numbers in his appraisal analysis for Sand Investment: "Please use the following information for the final appraisal. Development costs of 36,000 per lot, amenities 3,500,000, development cost for commercial- 500,000. Land Planner-1 will send you final before and after plans to be sure you have the correct ones."

140. By appraisal report dated January 4, 2016, WEIBEL appraised Sand Investment's conservation easement donation to be worth $80,150,000. The appraisal for Sand Investment included identical values for costs per lot and amenities as FISHER directed in his email.

### Inland Capital Appalachian Fund 2015

141. On or about December 19, 2014, FISHER, SINNOTT, and other co-conspirators organized and caused to be organized Inland Capital Appalachian Fund 2015, LLC ("ICAF 2015"). ICAF 2015 purchased approximately a 98% ownership interest in Jenny's Lane, LLC ("Jenny's Lane"), which owned land located within Lyon County, Nevada.

142. On or about December 29, 2015, Jenny's Lane donated land to a non-profit organization.

143. By appraisal report dated January 7, 2016, WEIBEL appraised the Jenny's Lane donation to be worth $11,000,000.

144.   ICAF 2015 also purchased approximately a 98% ownership interest in NC Whisper Mountain Holdings, LTD ("Whisper Mountain"), which owned land located within Western North Carolina.

145.   On or about December 10, 2014, JOY sent an email to ROBERTS with a copy to FISHER that attached "calculations for Whisper Mountain."   The attachment included a spreadsheet that provided the numbers ROBERTS should use in his "analysis" for valuing the conservation easement for Whisper Mountain as well as a valuation of the conservation easement tax deduction of $13,614,880.

146.   On or about December 10, 2014, FISHER sent ROBERTS an email with an attachment called "broker opinion and preliminary appraisal," from which ROBERTS copied and pasted portions into his final appraisal for Whisper Mountain.

147.   On December 12, 2014, ROBERTS sent an email to FISHER with a preliminary valuation of Whisper Mountain, stating: "Here is a quick prelim DCF. Pretty close to yours $13,893,000.  I am assuming it has 175 acres so after value would be $350,000.   Easement value of $13,543,000."   The attachment to ROBERTS's email included a spreadsheet that contained many of the same numbers and inputs that JOY had provided to ROBERTS two days earlier on December 10, 2014.

148.   On or about December 31, 2015, FISHER, SINNOTT, and JOY caused Whisper Mountain to donate a conservation easement on the land to Land Conservancy 1.

149.   By appraisal report dated March 6, 2016, ROBERTS appraised Whisper Mountain's conservation easement donation to be worth $13,510,000.

*Inland Capital Property Fund 2015*

150.   On or about December 19, 2014, FISHER, SINNOTT, JOY and other co-conspirators organized and caused to be organized Inland Capital Property Fund 2015, LLC ("ICPF 2015").   ICPF 2015 purchased approximately a 99.9%

ownership interest in Chestatee Holding Company, LLC ("Chestatee"), which owned land located within the Northern District of Georgia.

151.   One year later, on or about December 31, 2015, FISHER, SINNOTT, and JOY caused Chestatee to donate a conservation easement on a portion of the land to Land Conservancy 1.

152.   By appraisal report dated March 15, 2016, ROBERTS appraised Chestatee's conservation easement donation to be worth $36,020,000.

### Organizing, Marketing, and Selling Units in the Shelters

153.   In 2015, FISHER, SINNOTT, JOY, LEWIS, SMITH, Stein Agee, Corey Agee, and other co-conspirators promoted and sold units in the SCE Tax Shelters to high-income participants.

154.   On or about March 4, 2015, LEWIS pitched Client-3 on purchasing units in the 2015 Shelters after inquiring about Client–3's income for the 2015 tax year: "Did your deal for this year close? If so we need to get you into the 2015 LLC so you can get a tax savings this year as well." On the same date, after Client-3 informed LEWIS that Client–3's business deal would close in 2015, thus increasing Client–3's 2015 income, LEWIS responded, "I will get you the information on the 2015 [SCE] Fund soon since it sounds like it is going to be a big income year again."

155.   On or about May 21, 2015, FISHER emailed a potential participant to persuade him to purchase units in the 2015 Shelter early in the year. FISHER assured him that his subscription agreement was not binding, "If you end up oversubscribing we will allow you to reduce your subscription without penalty and refund that portion of your subscription."

156.   On or about September 24, 2015, JOY sent an email to a co-promoter with a copy to FISHER that provided marketing material for ICCF. The following day, the co-promoter asked for "the estimated tax write off" and FISHER responded the same day to the co-promoter that it would be "450,000 for every 100,000 in investment" even though neither ROBERTS nor WEIBEL had yet to

prepare an appraisal. A few months later, WEIBEL subsequently provided an appraisal for Sand Investment—the Property Company underlying ICCF—that delivered a nearly identical ratio as FISHER had promised to the co-promoter.

157.   In 2016, FISHER, Stein and Corey Agee, and other co-conspirators sold units in a prior year Shelter, ICAF 2015, and backdated, and caused to be backdated, related documents to make it appear that the purchases had been made in tax year 2015.

158.   On or about February 12, 2016, FISHER sent an email to a co-promoter, requesting that his clients pay for their units in 2015 funds, "I do have some Fund obligations coming up in March and need to be sure we get the monies collected." When the co-promoter apparently failed to send the money, FISHER followed up by email dated February 18, 2016, "I hate to keep bugging you but I have business issues to deal with. Can you provide me with dates you know you can make work for the accounts receivable from your clients? . . . We turned away a good bit of money at year end to make room for your clients. I'm going to get a lot of heat as to why we have amounts still owed."

159.   On or about February 19, 2016, JOY followed up with the co-promoter, instructing him that one of his clients needed to send both a subscription agreement and check for the purchase of his units in ICPF 2015.

160.   In or around April 22, 2016, FISHER, SINNOTT, ROBERTS and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for Whisper Mountain that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution deduction in the amount of $13,510,000 based on the donation of a conservation easement.

161.   In or around April 18, 2016, FISHER, SINNOTT, WEIBEL, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for Jenny's Lane that included a false Form 8283 that fraudulently claimed a non-cash charitable contribution deduction in the amount of $11,000,000.

162.   In or around April 18, 2016, FISHER, SINNOTT, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for ICAF 2015 that fraudulently claimed a flow-through conservation easement donation deduction from Whisper Mountain and fee simple donation from Jenny's Lane in the amount of $24,019,800.

163.   In or around April 18, 2016, FISHER, SINNOTT, ROBERTS, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for Chestatee that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution deduction in the amount of $36,020,000 based on the donation of a conservation easement.

164.   In or around April 18, 2016, FISHER, SINNOTT, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for ICPF 2015 that fraudulently claimed a flow-through conservation easement donation deduction from Chestatee in the amount of $35,983,980.

165.   In or around April 18, 2016, FISHER, SINNOTT, WEIBEL and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for Sand Investment that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution deduction in the amount of $80,150,000 based on the donation of a conservation easement.

166.   In or around April 18, 2016, FISHER, SINNOTT, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for ICCF 2015 that fraudulently claimed a flow-through conservation easement donation deduction from Sand Investment in the amount of $65,101,010.

167.   During 2016, LEWIS and other co-conspirators aided and assisted in the preparation of false and fraudulent returns for clients for tax year 2015 that fraudulently reported charitable contribution deductions based on the clients'

45

participation in the SCE Tax Shelters, with the preparation of each such return constituting an overt act.

## 2016 AND THE 2016 TAX SHELTERS

### Coastal Properties Holdings

168.   On or about November 18, 2015, FISHER, SINNOTT, and other co-conspirators organized and caused to be organized Coastal Properties Holdings, LLC ("CPH").   CPH purchased, through an intermediary entity, a majority ownership interest in Crimson Independence LLC ("Crimson Independence"), which owned land in Jasper County, South Carolina.

169.   On or about November 17, 2016, WEIBEL sent SINNOTT an email with the subject line "East Argent DCF" that contained an attachment of an excel spreadsheet valuing the fair market value of the property held by Crimson Independence before the placement of the easement at $154,900,000.

170.   The next day, on or about November 18, 2016, SINNOTT responded to WEIBEL's email with an attachment of an updated excel spreadsheet that valued the fair market value of the property before the placement of the easement at $191,100,000—i.e., $36.2 million higher than WEIBEL's initial number.

171.   By appraisal report dated December 30, 2016, WEIBEL appraised Crimson Independence's conservation easement donation to be worth $179,760,000.   WEIBEL's appraisal valued the fair market value before the placement of the easement at $192,270,000, i.e., approximately SINNOTT's desired number.

172.   On or about December 30, 2016, FISHER, SINNOTT, and JOY caused Crimson Independence to donate a conservation easement on a portion of the land to Land Conservancy 1.

173.   CPH also purchased, through an intermediary entity, a majority ownership interest in Old Paris Landing Holdings, LLC ("Old Paris"), which owned land located in Stewart County, Tennessee.

174.   On or about December 29, 2016, FISHER, SINNOTT, and JOY caused Old Paris to donate a conservation easement on a portion of the land to Land Conservancy 1.

175.   By appraisal report dated January 6, 2017, WEIBEL fraudulently appraised Old Paris's conservation easement donation to be worth $15,145,000.

### Inland Capital Sierra Holdings

176.   On or about April 30, 2015, FISHER, SINNOTT, and other co-conspirators organized and caused to be organized Inland Capital Sierra Holdings, LLC ("ICSH").   ICSH purchased approximately a 95% ownership interest in Hillside Holdings, LLC ("Hillside"), which owned land located in Washoe County, Nevada.

177.   On or about December 29, 2016, FISHER, SINNOTT, and JOY caused Hillside to donate a conservation easement on the land to Land Conservancy 2.

178.   By appraisal report dated December 30, 2016, WEIBEL appraised Hillside's conservation easement donation to be worth $44,425,000.

179.   In the appraisal, WEIBEL falsely represented in his appraisal that Hillside had entitlements for 294 single family residential lots when it only had tentative approval for 151 lots.

180.   ICSH also purchased, through an intermediary entity, an ownership interest in Nautical Hill Holdings, LLC ("Nautical Hill"), which owned land located in Lincoln County, Oregon.

181.   On or about December 28, 2016, FISHER, SINNOTT, and JOY caused Nautical Hill to donate a conservation easement on a portion of the land to Land Conservancy 2.

182.   By appraisal report dated December 28, 2016, WEIBEL appraised Nautical Hill's conservation easement donation to be worth $30,330,000.

### Organizing, Marketing, and Selling Units in the Tax Shelters

183.   In 2016, FISHER, SINNOTT, JOY, LEWIS, SMITH, Stein Agee, Corey Agee, and other co-conspirators promoted and sold units in the SCE Tax Shelters to high-income participants.

184.   In response to concerns Client -10 had expressed about purchasing units in an SCE Tax Shelter only through ICM, on or about May 5, 2016, LEWIS emailed Client -10:

> If you were looking for a return as an investment in the company I think that would be a concern. However, since in less than a year you get all your money back through tax savings I do not think that is a concern. . . . I have a sense . . . that putting more [charitable deductions from conservation easements] from different sources would increase the opportunity to have IRS scrutiny.

185.   On or about July 27, 2016, a co-promoter emailed FISHER and JOY and informed them that he was meeting with a client to promote the 2016 offering, asking "Can I assume the same 4.5:1 write off as in the previous years?" FISHER responded, "Our internal projections indicate that the deductions will be similar to prior years which is generally around 4.5 to 1."

186.   On or about September 20, 2016, FISHER emailed a participant about his potential interest in a 2016 Tax Shelter. The participant asked FISHER, "I'll probably commit to 100K as I have done in the past. Assuming the ratios as [sic]

the same as previous years." FISHER assured him that "[t]he economics will be the same as prior years."

187.    On or about September 28, 2016, JOY provided edits to an email about the sales pitch used to describe how the participant would get a tax deduction if the Green Option was selected and stated that a "sample of calculations of historic returns [was] attached." The following day, on or about September 29, 2016, FISHER forwarded JOY's edits to a co-promoter, copying JOY and the co-promoter, and explained, "We do not like to project future tax benefits but would rather reference historical results.  You will need to verbally discuss with your clients the expected tax deduction which will be consistent with prior year results."

188.    On or about October 20, 2016, LEWIS emailed Client-9 and wrote:

> I am going to be meeting with the [Company 1] folks in the next couple of weeks. They will want me to give them what I think my final numbers are and when to expect the subscriptions to come in. . . . I know you said income for 2016 will not be as high as for 2016 [sic], but do you think you will still need a unit? . . . Just let me know what you think your total income will be. I know you will have the gain from the sale of the Condo we need to take into account.

189.    In or around December 2016, Stein Agee instructed two of his client participants, at FISHER's direction, to "vote" for the development option for the CPH Tax Shelter, explaining that for "optics," some investors needed to vote for the development option to make the vote appear more legitimate.  Stein Agee further explained that there were already enough "green option" votes for the conservation easement donation, so the creation of the false charitable deductions was already ensured.  The participants thereafter voted for the development option knowing that the green option would prevail.

190.   In 2017, FISHER, Stein Agee, LEWIS, and other co-conspirators sold units in CPH and backdated, and caused to be backdated, related documents to make it appear that the units were purchased in tax year 2016.

191.   On or about February 10, 2017, a co-promoter emailed JOY and asked if a client could purchase an additional unit for a 2016 Tax Shelter.  JOY confirmed that the client could send in an additional check for ICSH.  On or about February 27, 2017, JOY confirmed receipt of the additional late payment from the client.

192.   In or around April 2017, SMITH directed Client-12 to backdate a check to purchase units in CPH.  SMITH directed Client-12 to backdate the check to December 2016 to disguise the fact that the units were purchased and the check was written and signed in April 2017.

193.   On or about April 15, 2017, a co-promoter sent an email to FISHER and JOY, telling them that a client would like to place another $100,000 into the SCE Tax Shelter "for 2016" if additional units were available.  On or about May 30, 2017, JOY sent an email to the co-promoter, confirming receipt of the $100,000 check on behalf of the co-promoter' client for a 2016 SCE Tax Shelter.

194.   On or about July 1, 2017, FISHER, copying JOY, emailed a participant about his failure to pay for his eight partnership units in a 2016 Tax Shelter. FISHER wrote, "[o]ur records indicate that we still have not received payment for your subscription of 400,000.  We need to receive your payment so we can properly issue your k-1."

195.   In or around August 2017, SMITH inquired whether there were any available units left for any 2016 SCE Tax Shelters.  After learning there were, SMITH's client, Client-13, was instructed to transfer the funds to purchase one unit in CPH, which she did on or about August 29, 2017.

196.   On or around September 15, 2017, FISHER, SINNOTT, WEIBEL, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for Old Paris that included a false Form

8283 and that fraudulently claimed a non-cash charitable contribution deduction in the amount of $15,146,000 based on the donation of a conservation easement.

197.   On or around September 15, 2017, FISHER, SINNOTT, WEIBEL, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for Crimson Independence that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution deduction in the amount of $179,760,000 based on the donation of a conservation easement.

198.   On or around September 16, 2017, FISHER, SINNOTT, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for CPH that fraudulently claimed flow-through conservation easement donation deductions from Old Paris and Crimson Independence in the amount of $185,517,036.

199.   On or around September 20, 2017, FISHER, SINNOTT, WEIBEL, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for Hillside that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution deduction in the amount of $44,425,000 based on the donation of a conservation easement.

200.   On or around September 15, 2017, FISHER, SINNOTT, WEIBEL, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for Nautical Hill that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution deduction in the amount of $30,330,000 based on the donation of a conservation easement.

201.   On or around September 15, 2017, FISHER, SINNOTT, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for ICSH that fraudulently claimed flow-through conservation easement donation deductions from Hillside and Nautical Hill in the amount of $49,426,536.

202.    During 2017, LEWIS, SMITH, and other co-conspirators aided and assisted in the preparation of false and fraudulent returns that were signed under penalties of perjury and filed with the IRS by clients for tax year 2016 that reported false charitable contribution deductions based on the clients' participation in the SCE Tax Shelters, with the preparation of each such false return constituting an overt act.

## 2017 AND THE 2017 SCE TAX SHELTERS

### Community Investment Partnership

203.    On or about September 14, 2016, FISHER, SINNOTT, and other co-conspirators organized and caused to be organized Community Investment Partnership, LLC ("CIP"). CIP purchased approximately a 90% ownership interest in Figure 8 (Highlands), LLC ("Figure 8 (Highlands)"), which owned land located in Baldwin County, Alabama.

204.    On or about December 28, 2017, FISHER, SINNOTT, and JOY caused Figure 8 (Highlands) to donate a conservation easement on a portion of the land to Land Conservancy 2.

205.    By appraisal report dated February 15, 2018, WEIBEL appraised Figure 8 (Highlands)'s conservation easement donation to be worth $182,500,000.

### Open Vista Holdings

206.    On or about September 14, 2016, FISHER, SINNOTT, and other co-conspirators organized and caused to be organized Open Vista Holdings, LLC ("OVH"). OVH purchased approximately a 99% ownership interest in Sandlapper Hill, LLC ("Sandlapper"), which owned land located in Beaufort County, South Carolina.

207.    On or about December 29, 2017, FISHER, SINNOTT, and JOY caused Sandlapper to donate a conservation easement on a portion of the land to Land Conservancy 2.

208.   By appraisal report dated January 18, 2018, WEIBEL appraised Sandlapper's conservation easement donation to be worth $24,420,000.

209.   OVH also purchased an 89% ownership interest in Argent TH A, LLC ("Argent TH A"), which owned land located in Jasper County, South Carolina.

210.   On or about December 27, 2017, Argent TH A donated the land to a non-profit organization.

211.   By appraisal report dated December 8, 2017, WEIBEL appraised Argent TH A's donation to be worth $10,060,000.

### Coastal Community Partners

212.   On or about September 14, 2016, FISHER, SINNOTT, and other co-conspirators organized and caused to be organized Coastal Community Partners, LLC ("CCP").   CCP purchased, through an intermediary entity, approximately a 99% ownership interest in Figure 8 (Georgia), LLC ("Figure 8 (Georgia)"), which owned land located in Chatham County, Georgia.

213.   On or about December 28, 2017, FISHER, SINNOTT, and JOY caused Figure 8 (Georgia) to donate a conservation easement on a portion of the land to Land Conservancy 2.

214.   By appraisal report dated January 20, 2018, WEIBEL appraised Figure 8 (Georgia)'s conservation easement donation to be worth $96,810,000.

### Organizing, Marketing, and Selling Units in the Tax Shelters

215.   In 2017, FISHER, SINNOTT, JOY, LEWIS, SMITH, Stein Agee, Corey Agee, and other co-conspirators promoted and sold units in the SCE Tax Shelters to high-income participants.

216.    On or about June 29, 2017, a participant emailed JOY and asked her to confirm that the 2017 Shelter is "still a 4.5 x deal?" JOY responded, "Yes, . . . same ratio as in 2016."

217.    On or about August 1, 2017, the participant emailed FISHER to let him know that he was "anticipating the receipt of your 2017 development prospectus." The participant further explained, "My approximate gift need this year will be $1.6 million. (Or AGI of 3.8mm minus $300,000 in carryovers.)." He then asked if FISHER would discount the purchase price of his units if he paid immediately. That same day, FISHER responded, "Yes, I will consider. I will send you a draft of the executive summary tomorrow. You will like the investment."

218.    In 2018, FISHER, LEWIS, Stein and Corey Agee, and others sold units in CCP and backdated, and caused to be backdated, related documents, including promissory notes, to make it appear that the purchases were made in 2017.

219.    On or about January 22, 2018, LEWIS emailed Client -11 about his purchase of units in CCP and stated that Client -11's check for purchase of one unit "need[ed] to be made payable to Coastal Community Partners, LLC in the amount of $25,000 and dated the same day the agreement was signed (12/29/17)."

220.    On or around September 21, 2018, FISHER, SINNOTT, WEIBEL, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for Sandlapper that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution donation deduction in the amount of $24,420,000 based on the donation of a conservation easement.

221.    On or around September 24, 2018, FISHER, SINNOTT, WEIBEL, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for Argent TH A that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution donation deduction in the amount of $10,060,000.

222.    On or around September 15, 2018, FISHER, SINNOTT, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for OVH that fraudulently claimed flow-through charitable contribution deductions from Sandlapper and Argent TH A in the amount of $33,129,200.

223.    On or around September 24, 2018, FISHER, SINNOTT, WEIBEL, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for Figure 8 (Highlands) that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution deduction in the amount of $182,500,000 based on the donation of a conservation easement.

224.    On or around September 15, 2018, FISHER, SINNOTT, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for CIP that fraudulently claimed a flow-through conservation easement donation deduction from Figure 8 (Highlands) in the amount of $164,250,000.

225.    In or around September 21, 2018, FISHER, SINNOTT, WEIBEL, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for Figure 8 (Georgia) that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution deduction in the amount of $96,810,000 based on the donation of a conservation easement.

226.    In or around September 15, 2018, FISHER, SINNOTT, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for CCP that fraudulently claimed a flow-through conservation easement donation deduction from Figure 8 (Georgia) in the amount of $95,841,900.

227.    During 2018, LEWIS, SMITH, and other co-conspirators aided and assisted in the preparation of false and fraudulent tax returns for clients for tax year 2017 that were signed under penalties of perjury and filed with the IRS that

fraudulently reported charitable contribution deductions based on the clients' participation in the SCE Tax Shelters, with the preparation of each such return constituting an overt act.

## 2018 AND THE 2018 TAX SHELTERS

### Mountaintop Vista Holdings

228.  On or about December 26, 2017, FISHER, SINNOTT, and other co-conspirators organized and caused to be organized Mountaintop Vista Holdings, LLC ("Mountaintop Vista"). Mountaintop Vista purchased approximately a 99% ownership interest in Winnemucca Holdings, LLC ("Winnemucca"), which owned land located in Washoe County, Nevada.

229.  On or about July 30, 2018, FISHER sent an email to SINNOTT, JOY, Land Planner-1 and Land Broker-1 attaching a document titled "Final Draft – Exec. Summary – Mountaintop Vista Holdings, LLC (Marshall Ranch, NV)." In the email FISHER noted, "We have a lot of work to do to support this." He then outlined the various tasks to be completed to support valuation:

> FISHER: I believe our projections are based on 10mm for infrastructure and 10m for amenities so we need to make sure our numbers work. Finally, we need to come up with a plan for the water. If this is examined it will not look good to see this as a barren waste land with respect to future value in the after plan.

230.  On or about December 28, 2018, FISHER, SINNOTT, and JOY caused Winnemucca to donate a conservation easement on a portion of the land to Land Conservancy 2.

231.  By appraisal report dated February 27, 2018, presumably intended to be dated February 27, 2019, WEIBEL appraised Winnemucca's conservation easement donation to be worth $51,980,000.

232.   WEIBEL falsely claimed in his appraisal that the land was zoned to allow 199 single family lots when, in reality, the zoning permitted, at most, approximately 25 lots.

### Eastern Sierra Holdings

233.   On or about December 26, 2017, FISHER, SINNOTT, and other co-conspirators organized Eastern Sierra Holdings, LLC ("ESH"). ESH purchased an ownership interest in Storm Crow, LLC ("Storm Crow"), which owned land located within Alpine County, California.

234.   On or about December 27, 2018, FISHER, SINNOTT, and JOY caused Storm Crow to donate a conservation easement on a portion of the land to Land Conservancy 2.

235.   By appraisal report dated February 11, 2019, WEIBEL appraised Storm Crow's conservation easement donation to be worth $85,180,000.

### Southeast Property Acquisition

236.   On or about December 26, 2017, FISHER, SINNOTT, and other co-conspirators, organized and caused to be organized Southeast Property Acquisition, LLC ("SPA"). SPA purchased approximately an 80% ownership interest in Equity Investment Associates, LLC ("EIA"), which owned land located in Brunswick County, North Carolina.

237.   On or about December 27, 2018, FISHER, SINNOTT, and JOY caused EIA to donate a conservation easement on a portion of the land to Land Conservancy 2.

238.   By appraisal report dated April 1, 2019, ROBERTS appraised EIA's conservation easement donation to be worth $223,050,000.

*Organizing, Marketing, and Selling Units in the Tax Shelters*

239.   In 2018, FISHER, SINNOTT, JOY, LEWIS, SMITH, Stein Agee, Corey Agee, and other co-conspirators promoted and sold units in the SCE Tax Shelters to high-income participants.

240.   In or around July 2018, FISHER asked Stein Agee to use the IRS audit of Individual B as leverage to persuade Individuals A and B to sign documents pertaining to Ft. Myers and Thompson Mountain.  FISHER also asked Stein Agee to delay the production of documents related to the IRS audit of Individual B until after the statute of limitations for the Ft. Myers and Thompson Mountain transactions had passed.

241.   On or about July 17, 2018, FISHER informed Individuals A and B that they planned to delay the audit past the statute of limitations date for Ft. Myers and Thompson Mountain.

242.   On or about July 17, 2018, FISHER directed Individuals A and B to backdate certain documents to "paper" the file of the Ft. Myers and Thompson Mountain transactions for the IRS audit.

243.   In 2019, FISHER, SINNOTT, JOY, LEWIS, SMITH, and other co-conspirators, in the Northern District of Georgia and elsewhere, promoted and sold units in SPA after the close of the 2018 tax year.

244.   In 2019, FISHER, LEWIS, and others sold units in 2018 SCE Tax Shelters and backdated, and caused to be backdated, related documents to make it appear that the units had been purchased in 2018.

245.   On or about January 7, 2019, FISHER sent a text message to a co-promoter about the availability of units in a 2018 Tax Shelter and explained that "we can accommodate the 300K but we are definitely full now. Have them date the agreement and check December 28th and overnight to 750 Hammond drive."

246.   In or around 2019, LEWIS unlawfully directed Client -2 to backdate two checks to purchase units in SPA.

247.   In or around September 2019, LEWIS unlawfully directed Client -7 to backdate a check to purchase units in SPA.  LEWIS directed Client -7 to date the check December 2018 to disguise the fact that the check had been signed in September 2019.

248.   On or about February 6, 2019, SINNOTT sent the following text message to a participant: "We need a subscription agreement for 200k.  I'll print one out and leave it here for you [sic] fill out and leave a check."  SINNOTT then subsequently stated: "We have the sub doc.  Just need a check.  Dated last year."  The participant did not feel comfortable fraudulently backdating a check and sent a wire payment instead.

249.   In or around February 2019, ICM and Accounting Firm 1 were trying to finalize the Forms Schedule K-1 to be sent to participants but were unable to complete the numbers for SPA.  On or about February 26, 2019, ICM employee-2 emailed Accountant-1 and explained, "Jack [FISHER] added several investors today.  I'm at UPS sending docs for these now.  We still don't have final raise number for the SPA fund and need him and Jim to agree on Sinnott and Co's unit."

250.   On or about April 25, 2019, JOY sent an email to a participant about purchasing units in the 2018 SPA Tax Shelter and attached the Executive Summary of the Offering, the PPM, the Subscription Package, and Wire Instructions.

251.   On or about May 10, 2019, a participant emailed JOY and confirmed that he wanted to purchase units in the 2018 SPA Tax Shelter: "Just following up that we definitely want to pursue the 2018 opportunity.  I'm working out figures with [my accountant] so should get to the bottom of it in [sic] next few weeks. . . . Anyhow just wanted to check on deadline to get this signed/paid to you."  Approximately six weeks later, on or about July 24, 2019, a participant emailed JOY and informed her that he had sent his paperwork and check by FedEx.

252.   On or about May 15, 2019, FISHER spoke with UCA-1.   FISHER advised that he had between a half million dollars and two million dollars in deductions remaining from 2018 that he could sell, but FISHER cautioned: "[Y]ou got to be real careful. Make sure it's somebody you know of because . . . we've got to basically backdate the (inaudible) agreement, which is – by the way, it's not really a huge deal."   FISHER later clarified, "and remember, '18 we just keep between us and phone calls. Okay?"

253.   On or about July 22, 2019, FISHER and a co-conspirator, known to the grand jury, met with UCA-1 in the Northern District of Georgia. FISHER and ICM employee-1 advised UCA-1 on filling out a backdated document for a 2018 fund.  When asked what to do about the date, ICM employee-1 said to "put in last year," and FISHER advised to "put down 12/15 last year."  ICM employee-1 then later specified that the date needed to be listed as "12/15/18."  When asked how to pay for the units, FISHER advised that "a check would be best."

254.   On or around September 23, 2019, FISHER, SINNOTT, WEIBEL, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for Winnemucca that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution deduction in the amount of $51,980,000 based on the donation of a conservation easement.

255.   On or around September 16, 2019, FISHER, SINNOTT, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for Mountaintop Vista that fraudulently claimed a flow-through conservation easement donation deduction from Winnemucca in the amount of $51,460,200.

256.   On or around September 16, 2019, FISHER, SINNOTT, ROBERTS, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for EIA that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution deduction in the amount of $223,050,000 based on the donation of a conservation easement.

257.   On or around September 16, 2019, FISHER, SINNOTT, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for SPA that fraudulently claimed a flow-through conservation easement donation deduction from EIA in the amount of $178,440,000.

258.   On or around September 16, 2019, FISHER, SINNOTT, WEIBEL, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for Storm Crow that included a false Form 8283 and that fraudulently claimed a non-cash charitable contribution deduction in the amount of $85,180,000 based on the donation of a conservation easement.

259.   On or around September 16, 2019, FISHER, SINNOTT, and Stein Agee prepared and filed, and caused to be prepared and filed, a false Form 1065, U.S. Return of Partnership Income for ESH that fraudulently claimed a flow-through conservation easement donation deduction from Storm Crow in the amount of $85,180,000.

260.   During 2019, LEWIS, SMITH, and other co-conspirators aided and assisted in preparing false and fraudulent returns for clients for tax year 2018 that reported false charitable contribution deductions on their tax returns that were signed under penalties of perjury and filed with the IRS, based on the clients purchase of units in the SCE Tax Shelters, with the preparation of each such return constituting an overt act.

### 2019 AND THE 2019 TAX SHELTER

### Bay Creek Acquisitions

261.   On or about October 17, 2019, FISHER, SINNOTT, and other co-conspirators organized and caused to be organized Bay Creek Acquisitions, LLC ("BCA 2019"). BCA 2019 purchased an ownership interest in Bay Creek South, LLC ("Bay Creek"), which owned land located in Cape Charles, Virginia.

61

262.   On or about December 30, 2019, FISHER, SINNOTT, and JOY caused Bay Creek to donate a conservation easement on a portion of the land to a land conservancy.

263.   On or about October 23, 2019, one of ROBERTS's employees sent an email to Attorney A, SINNOTT, and Accountant-1 with a copy to ROBERTS in which the employee requested appraisal information for Bay Creek, including (a) "[d]etails on the before and after plan with regards to number of lots and types, amenities, and improvement costs," (b) "[c]onservation document to be used and amount of land to be conserved," and (c) "[a]ny related illustrations or documents."

264.   On or about October 24, 2019, Accountant-1 sent an email to ROBERTS's employee stating, "We are still finalizing Bay Creek – should [sic] operational numbers for you by tomorrow morning."

265.   On or about October 29, 2019, ROBERTS's employee sent an email to Accountant-1 with a copy to, among others, Attorney A, SINNOTT, and ROBERTS, stating "I wanted to check in on Bay Creek to see if cost estimates are available yet." Accountant-1 responded a few minutes later stating, "We have the final numbers for the appraisal. The HBU [highest and best use] plans and After Plans are in dropbox. Do you have access to those?" In that same email response, Accountant-1 asked one of SINNOTT's subordinates to "pull out the appraisal tab of our working models to forward to [ROBERT's employee]." ROBERTS's employee thereafter confirmed that he had "access to everything on the drop box," which included "visual layouts and lot number estimates in the HBU/After plans" for Bay Creek.

266.   On or about November 1, 2019, SINNOTT's subordinate provided ROBERTS and ROBERTS's employee with a spreadsheet that had three tabs called (a) Appraisal, (b) After Phasing Plan, and (c) HBU Phasing Plan. The appraisal tab of the spreadsheet listed a conservation easement deduction of $158,602,863 of which $141,156,548 would be allocated to the participants. The spreadsheet also contained a "CE Ratio CHECK" that ensured the participants' deduction amount would be at least four times the amount of money raised from the participants.

267.    On or about November 13, 2019, FISHER sent an email to financial advisors that included marketing material for the Bay Creek Tax Shelter.  In an Executive Summary attached to the email, FISHER and ICM projected that the participants' total capital raise for the Tax Shelter would generate $59,285,750 of tax savings based on a conservation easement tax deduction of $141,156,548—the exact dollar amount provided to ROBERTS approximately two weeks earlier.

268.    On or about December 18, 2019, ROBERTS informed FISHER that he no longer intended to perform an appraisal for Bay Creek.

269.    By appraisal report dated May 27, 2020, Appraisal Firm 3 appraised Bay Creek's conservation easement donation to be worth $138,680,000.

270.    On or about July 7, 2020, FISHER sent an email explaining that "the expected tax deduction was about 10% less than expected" because "it was prudent to retain an appraiser that we had no prior affiliation with to do this year's appraisal."

### Organizing, Marketing, and Selling Units in the Tax Shelters

271.    On or about December 13, 2019, JOY, copying a co-conspirator known to the Grand Jury, emailed a participant instructing him to wire funds for his units in the 2019 Tax Shelter.  JOY further explained that "Investors will be voting the week after Christmas.  Manager's recommendation will be the Conservation Development Plan.  Usually, investors vote in favor of Manager's recommendation."

272.    On or about December 13, 2019, a participant responded to JOY's email, copying a co-conspirator known to the grand jury, and asked, "Can I hold off on wiring funds until vote?  I only want to invest if it is indeed Conservation Dev Plan."  The next day, JOY responded, copying a co-conspirator known to the grand jury, "Sounds good, just make sure you fund before 12/31."

*2020*

273.   In 2020, after Perquimans, a newly structured Tax Shelter that delivered significantly reduced tax deductions, failed to attract sufficient participants, FISHER, SINNOTT, and JOY, and other co-promoters moved participants who had purchased units in Perquimans into Bay Creek, the other 2019 Tax Shelter promoted by FISHER and the conspirators.

274.   In 2020, after becoming aware of the criminal investigation, FISHER informed Stein Agee that he had met with several other co-conspirators to ensure that they were on the "same page" about the late subscriptions.

275.   Similarly, as he had on prior occasions, in 2020, FISHER suggested Stein Agee could falsely claim that the backdated checks the government had recovered were not deposited until after the close of the tax year because they had been "lost" on somebody's desk.

276.   On or about November 4, 2020, FISHER left a handwritten note for Stein Agee in Stein Agee's office at Accounting Firm 1, which stated that he had been "cleaning up the books."   FISHER informed Stein Agee that Stein Agee's client. had a "$100,000 receivable outstanding in SPA."   FISHER's note also referenced a 2017 SCE Tax Shelter and stated that the tax return for the Fund had a Schedule K-1 issued to an "LTS investor" [Left to Sell] in the amount of $750,000.

All in violation of Title 18, United States Code, Section 371.

## Count Two
*Wire Fraud Conspiracy*
(18 U.S.C. § 1349)

277.   The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs one through 34 and 38 through 276 of this Superseding Indictment as if fully set forth herein.

278.   From at least in or about 2013 through at least in or about 2019, the exact dates unknown, in the Northern District of Georgia and elsewhere, JACK

FISHER together with others known and unknown to the Grand Jury, including at various times JAMES SINNOTT, YEKATERINA LOPUHINA a/k/a EKATERINA LOPUKHINA a/k/a KATE JOY, WALTER D. ROBERTS II a/k/a TERRY ROBERTS, and CLAY MICHAEL WEIBEL a/k/a CLAYTON WEIBEL, did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with each other to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property, including fees and commissions, by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts, well knowing and having reason to know that said pretenses were and would be false and fraudulent when made and caused to be made and that said omissions were and would be material, to wit, a scheme to defraud the IRS, and, in so doing, caused interstate wire communications to be made, in furtherance of the scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343.

## Object of the Conspiracy

279.   It was an object of the conspiracy that FISHER, SINNOTT, JOY, ROBERTS, and WEIBEL and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with each other to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property, including fees and commissions, by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts, to wit, a scheme to defraud the IRS through the organization, design, marketing, sale and implementation of the fraudulent Tax Shelters, and for the purpose of executing such scheme and artifice and attempting to do so, transmitted and caused to be transmitted by means of wire and radio communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, interstate telephone calls, faxes, and emails related to the organization, design, promotion, implementation, and sale of the SCE Tax Shelters, in violation of Title 18, United States Code, Section 1343.

## Manner and Means

280.   Throughout the conspiracy, FISHER, SINNOTT, JOY, ROBERTS, and WEIBEL utilized interstate wires to (1) email about the drafting of fraudulent promotional material; (2) email fraudulent promotional material to co-promoters and participants; (3) communicate about the sham vote; (4) communicate about the preparation of fraudulent appraisals; (5) communicate about backdating subscription agreements, checks, and other documents related to the Tax Shelter transactions; and (6) wire commission payments to co-promoters, as set forth in Paragraphs 1 through 34 and 38 through 276 of this Superseding Indictment, among others.

281.   FISHER, SINNOTT, JOY, ROBERTS, and WEIBEL and their co-conspirators, and others known and unknown to the Grand Jury, further carried out the object of the conspiracy through the manner and means described in paragraphs 39 through 75 of this Superseding Indictment, among others.

All in violation of Title 18, United States Code, Section 1349.

### Counts Three through Twenty-Six
*Wire Fraud*
(18 U.S.C. §§ 1343 and 2)

282.   The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs one through 34 and 38 through 276 of this Criminal Superseding Indictment as if fully set forth herein.

283.   Beginning in or about January 2014 and continuing until in or about March 2020, the exact dates unknown, in the Northern District of Georgia and elsewhere, HERBERT E. LEWIS aided and abetted by others known and unknown to the Grand Jury, knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property, including fees and commissions, by means of materially false and fraudulent pretenses, representations, and promises, and by omissions of material fact, well knowing and having reason to know that said pretenses, representations, and promises were false and fraudulent

66

when made and caused to be made and that said omissions were and would be material, to wit, a scheme to defraud the IRS by promoting and selling the Tax Shelters to fraudulently reduce the tax liability of the participants.

284. On or about the dates listed below for each count, in the Northern District of Georgia and elsewhere, HERBERT E. LEWIS, aided and abetted by others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud, and to obtain money and property, including fees and commissions, by means of materially false and fraudulent pretenses, representations, and promises, and omissions of material fact, did, with intent to defraud, cause to be transmitted by means of a wire communication in interstate commerce, certain writings, signs, signals, and sounds, as more specifically described below:

| Count | Date (on or about) | Interstate Wire Communication |
|-------|--------------------|-------------------------------|
| Count 3 | 4/15/2016 | Electronic filing of Client -6's 2015 Form 1040 with the IRS |
| Count 4 | 5/5/2016 | Email from Lewis to Client -10 referenced in paragraph 184 above |
| Count 5 | 10/13/2016 | Electronic filing of Client-1's 2015 Form 1040 with the IRS |
| Count 6 | 10/14/2016 | Electronic filing of Client-9's 2015 Form 1040 with the IRS |
| Count 7 | 10/14/2016 | Electronic filing of Client -8's 2015 Form 1040 with the IRS |
| Count 8 | 10/13/2017 | Electronic filing of Client-9's 2016 Form 1040 with the IRS |
| Count 9 | 10/15/2017 | Electronic filing of Client -6's 2016 Form 1040 with the IRS |
| Count 10 | 10/15/2017 | Electronic filing of Client -2's 2016 Form 1040 with the IRS |
| Count 11 | 1/22/2018 | Email from Lewis to Client -11 referenced in paragraph 219 above |

| Count | Date (on or about) | Interstate Wire Communication |
|---|---|---|
| Count 12 | 4/3/2018 | Electronic filing of Client -11's 2017 Form 1040 with the IRS |
| Count 13 | 9/19/2018 | Electronic filing of Client -6's 2017 Form 1040 with the IRS |
| Count 14 | 10/4/2018 | Electronic filing of Client -3's 2017 Form 1040 with the IRS |
| Count 15 | 10/8/2019 | Electronic filing of Client -3's 2018 Form 1040 with the IRS |
| Count 16 | 10/9/2019 | Electronic filing of Client -6's 2018 Form 1040 with the IRS |
| Count 17 | 10/9/2019 | Electronic filing of Client-2's 2018 Form 1040 with the IRS |
| Count 18 | 10/10/2019 | Electronic filing of Client -7's 2018 Form 1040 with the IRS |
| Count 19 | 10/11/2019 | Electronic filing of Client -10's 2018 Form 1040 with the IRS |
| Count 20 | 10/14/2019 | Electronic filing of Client -1's 2018 Form 1040 with the IRS |
| Count 21 | 10/13/2019 | Electronic filing of Client-12's 2018 Form 1040 with the IRS |
| Count 22 | 10/13/2019 | Electronic filing of Client -8's 2018 Form 1040 with the IRS |
| Count 23 | 10/14/2019 | Electronic filing of Client-5's 2018 Form 1040 with the IRS |
| Count 24 | 10/14/2020 | Electronic filing of Client -7's 2019 Form 1040 with the IRS |
| Count 25 | 10/14/2019 | Electronic filing of Client-4's 2018 Form 1040 with the IRS |
| Count 26 | 10/15/2020 | Electronic filing of Client -3's 2019 Form 1040 with the IRS |

All in violation of Title 18, United States Code, Section 1343 and Section 2.

## Counts Twenty-Seven through Thirty-Two
### *Wire Fraud*
(18 U.S.C. § 1343 and § 2)

285.   The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs one through 34 and 38 through 276 of this Superseding Indictment as if fully set forth herein.

286.   Beginning in or about January 2014 and continuing until in or about March 2020, the exact dates unknown, in the Northern District of Georgia and elsewhere, VICTOR SMITH aided and abetted by others known and unknown to the Grand Jury, knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property, including fees and commissions, by means of materially false and fraudulent pretenses, representations, and promises, and by omissions of material fact, well knowing and having reason to know that said pretenses, representations, and promises were false and fraudulent when made and caused to be made and that said omissions were and would be material, to wit, to wit, a scheme to defraud the IRS by promoting and selling the Tax Shelters to fraudulently reduce the tax liability of the participants.

287.   On or about the dates listed below for each count, in the Northern District of Georgia and elsewhere, VICTOR SMITH, aided and abetted by others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud, and to obtain money and property, including fees and commissions, by means of materially false and fraudulent pretenses, representations, and promises, and omissions of material fact, did, with intent to defraud, cause to be transmitted by means of a wire communication in interstate commerce, certain writings, signs, signals, and sounds, as more specifically described below:

| Count | Date (on or about) | Interstate Wire Communication |
|---|---|---|
| Count 27 | 7/31/2017 | Electronic filing of Client - 13's 2016 Form 1040 with the IRS |

| Count | Date (on or about) | Interstate Wire Communication |
|-------|--------------------|-------------------------------|
| Count 28 | 4/11/2018 | Electronic filing of Client -13's 2017 Form 1040 with the IRS |
| Count 29 | 09/9/2019 | Electronic filing of Client -14's 2018 Form 1040 with the IRS |
| Count 30 | 11/11/2017 | Electronic filing of Client -15's 2016 Form 1040 with the IRS |
| Count 31 | 10/15/2019 | Electronic filing of Client -15's 2018 Form 1040 with the IRS |
| Count 32 | 5/28/2019 | Electronic filing of Client -16's 2018 Form 1040 with the IRS |

All in violation of Title 18, United States Code, Section 1343 and Section 2.

## Counts Thirty-Three Through Forty-Eight
*Aiding and Assisting the Filing of False Tax Returns*
(26 U.S.C. § 7206(2))

288.    The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs one through 34 and 38 through 276 of this Superseding Indictment as if fully set forth herein.

289.    On or about each approximate date set forth below, in the Northern District of Georgia and elsewhere, JACK FISHER and JAMES SINNOTT did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation under the Internal Revenue Laws, of U.S. Return of Partnership Income, Forms 1065, and accompanying schedules for the taxpayers and calendar years specified below.   The returns were false and fraudulent as to material matters, in that they represented that the taxpayers were entitled under the provisions of the Internal Revenue Laws to claim deductions related to SCE Tax Shelters on the Schedule K, in the amounts listed on the taxpayers' returns, whereas, as FISHER and SINNOTT then and there knew and believed, these taxpayers were not entitled to claim those deductions identified below:

70

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 33 | Jenny's Lane, LLC | 04/18/2016 | 2015 | Schedule K, Line 13 a. $11,000,000.00 |
| Count 34 | NC Whisper Mountain Holdings Ltd | 04/22/2016 | 2015 | Schedule K, Line 13 a. $13,550,000.00 |
| Count 35 | Chestatee Holding Company, LLC | 04/18/2016 | 2015 | Schedule K, Line 13 a. $36,060,000.00 |
| Count 36 | Sand Investment Co., LLC | 04/18/2016 | 2015 | Schedule K, Line 13 a. $80,200,000.00 |
| Count 37 | Old Paris Landing Holdings, LLC | 09/15/2017 | 2016 | Schedule K, Line 13 a. $15,241,000.00 |
| Count 38 | Crimson Independence, LLC | 09/15/2017 | 2016 | Schedule K, Line 13 a. $179,885,000.00 |
| Count 39 | Hillside Holdings, LLC | 09/20/2017 | 2016 | Schedule K, Line 13 a. $44,485,000.00 |
| Count 40 | Nautical Hill Holdings, LLC | 9/15/2017 | 2016 | Schedule K, Line 13 a. $30,390,000.00 |
| Count 41 | Sandlapper Hill, LLC | 09/21/2018 | 2017 | Schedule K, Line 13 a. $24,480,000.00 |
| Count 42 | Argent TH A, LLC | 09/15/2018 | 2017 | Schedule K, Line 13 a. $10,060,000.00 |
| Count 43 | Figure 8 (Georgia), LLC | 9/21/2018 | 2017 | Schedule K, Line 13 a. $96,880.000.00 |
| Count 44 | Figure 8 (Highlands), LLC | 09/24/2018 | 2017 | Schedule K, Line 13 a. $182,500,000.00 |
| Count 45 | Winnemucca Holdings, LLC | 09/16/2019 | 2018 | Schedule K, Line 13 a. $52,040,000.00 |
| Count 46 | Equity Investment Associates, LLC | 09/23/2019 | 2018 | Schedule K, Line 13 a. $223,050,000.00 |
| Count 47 | Storm Crow, LLC | 09/16/2019 | 2018 | Schedule K, Line 13 a. $85,180,000.00 |
| Count 48 | Bay Creek South, LLC | 09/12/2020 | 2019 | Schedule K, Line 13 a. $138,680,000.00 |

All in violation of Title 26, United States Code, Section 7206(2).

**Counts Forty-Nine Through Fifty-One**
*Aiding and Assisting the Filing of False Tax Returns*
(26 U.S.C. § 7206(2))

290.   The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs one through 34 and 38 through 276 of this Superseding Indictment as if fully set forth herein.

291.   On or about each approximate date set forth below, in the Northern District of Georgia and elsewhere, WALTER D. ROBERTS II a/k/a TERRY ROBERTS did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation under the Internal Revenue Laws, of U.S. Return of Partnership Income, Forms 1065, and accompanying schedules for the taxpayers and calendar years specified below.   The returns were false and fraudulent as to material matters, in that they represented that the taxpayers were entitled under the provisions of the Internal Revenue Laws to claim deductions related to SCE Tax Shelters on the Schedule K, in the amounts listed on the taxpayers' returns, whereas, as ROBERTS then and there knew and believed, the appraised fair market value was false and, accordingly, the amounts listed as the amount of the non-cash charitable contribution deductions were false identified below:

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 49 | NC Whisper Mountain Holdings Ltd | 04/22/2016 | 2015 | a.  Form 1065, Schedule K, Line 13 a.<br>b.  Form 8283, Section B, Part 1, 5(A)(c) |
| Count 50 | Chestatee Holding Company, LLC | 04/18/2016 | 2015 | a.  Form 1065, Schedule K, Line 13 a.<br>b.  Form 8283, Section B, Part 1, 5(A)(c) |

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 51 | Equity Investment Associates, LLC | 09/16/2019 | 2018 | a. a. Form 1065, Schedule K, Line 13 a.<br>b. Form 8283, Section B, Part 1, 5(A)(c) |

All in violation of Title 26, United States Code, Section 7206(2).

### Counts Fifty-Two Through Sixty-Three
*Aiding and Assisting the Filing of False Tax Returns*
(26 U.S.C. § 7206(2))

292.   The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs one through 34 and 38 through 276 of this Superseding Indictment as if fully set forth herein.

293.   On or about each approximate date set forth below, in the Northern District of Georgia and elsewhere, CLAY MICHAEL WEIBEL a/k/a CLAYTON WEIBEL did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation under the Internal Revenue Laws, of U.S. Return of Partnership Income, Forms 1065, and accompanying schedules for the taxpayers and calendar years specified below.  The returns were false and fraudulent as to material matters, in that they represented that the taxpayers were entitled under the provisions of the Internal Revenue Laws to claim deductions related to SCE Tax Shelters on the Schedule K, in the amounts listed on the taxpayers' returns, whereas, as WEIBEL then and there knew and believed, the appraised fair market value was false and, accordingly, the amounts listed as the amount of the non-cash charitable contribution deductions were false identified below:

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 52 | Jenny's Lane, LLC | 04/18/2016 | 2015 | a. Schedule K, Line 13 a. $11,000,000.00<br>b. Form 8283, Section B, Part 1, 5(A)(c) |

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 53 | Sand Investment Co., LLC | 04/18/2016 | 2015 | a. Schedule K, Line 13 a. $80,200,000.00 <br> b. Form 8283, Section B, Part 1, 5(A)(c) |
| Count 54 | Old Paris Landing Holdings, LLC | 09/15/2017 | 2016 | a. Schedule K, Line 13 a. $15,241,000.00 <br> b. Form 8283, Section B, Part 1, 5(A)(c) |
| Count 55 | Crimson Independence, LLC | 09/15/2017 | 2016 | a. Schedule K, Line 13 a. $179,885,000.00 <br> b. Form 8283, Section B, Part 1, 5(A)(c) |
| Count 56 | Hillside Holdings, LLC | 09/20/2017 | 2016 | a. a. Schedule K, Line 13 a. $44,485,000.00 <br> b. Form 8283, Section B, Part 1, 5(A)(c) |
| Count 57 | Nautical Hill Holdings, LLC | 9/15/2017 | 2016 | a. Schedule K, Line 13 a. $30,390,000.00 <br> b. Form 8283, Section B, Part 1, 5(A)(c) |
| Count 58 | Sandlapper Hill, LLC | 09/21/2018 | 2017 | a. a. Schedule K, Line 13 a. $24,480,000.00 <br> b. Form 8283, Section B, Part 1, 5(A)(c) |
| Count 59 | Argent TH A, LLC | 09/24/2018 | 2017 | a. Schedule K, Line 13 a. $10,060,000.00 <br> b. Form 8283, Section B, Part 1, 5(A)(c) |
| Count 60 | Figure 8 (Georgia), LLC | 9/21/2018 | 2017 | a. Schedule K, Line 13 a. $96,800.000.00 <br> b. Form 8283, Section B, Part 1, 5(A)(c) |
| Count 61 | Figure 8 (Highlands), LLC | 09/24/2018 | 2017 | a. Schedule K, Line 13 a. $182,500,000.00 <br> b. Form 8283, Section B, Part 1, 5(A)(c) |

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 62 | Winnemucca Holdings, LLC | 09/23/ 2019 | 2018 | a. Schedule K, Line 13 a. $52,040,000.00<br>b. Form 8283, Section B, Part 1, 5(A)(c) |
| Count 63 | Storm Crow, LLC | 09/16/ 2019 | 2018 | a. Schedule K, Line 13 a. $85,180,000.00<br>b. Form 8283, Section B, Part 1, 5(A)(c) |

All in violation of Title 26, United States Code, Section 7206(2).

**Counts Sixty-Four Through Ninety-Five**
*Aiding and Assisting the Filing of False Tax Returns*
(26 U.S.C. § 7206(2))

294.   The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs one through 34 and 38 through 276 of this Superseding Indictment as if fully set forth herein.

295.   On or about each approximate date set forth below, in the Northern District of Georgia and elsewhere, HERBERT E. LEWIS did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation under the Internal Revenue Laws, of U.S. Individual Income Tax Returns, Forms 1040, and accompanying schedules for the taxpayers and calendar years specified below. The returns were false and fraudulent as to material matters, in that they represented that the taxpayers were entitled under the provisions of the Internal Revenue Laws to claim non-cash charitable contributions related to SCE Tax Shelters on Schedule A in the amounts listed on the taxpayers' returns, whereas, as LEWIS then and there knew and believed, these taxpayers were not entitled to claim those non-cash charitable contributions identified below:

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 64 | Client -7 | 10/7/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1 A ($237,613), B ($19,315), C ($288,264), and D ($31,299)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $542,606<br>c. Form 1040, Line 43, (Taxable Income) $483,249 |
| Count 65 | Client -7 | 10/10/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1B $446,100 |
| Count 66 | Client -7 | 10/14/2020 | 2019 | a. Schedule A, Line 13, (Charitable Contribution Carryover) $64,101<br>b. Form 1040, Line 11b, (Taxable Income) $833,453 |
| Count 67 | Client -3 | 10/5/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1D ($111,976)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $152,272<br>c. Form 1040, Line 43, (Taxable Income) $122,523 |
| Count 68 | Client -3 | 10/4/2018 | 2017 | a. Schedule A, Line 18, (Charitable Contribution Carryover) $118,817<br>b. Form 1040, Line 43, (Taxable Income) $87,506 |
| Count 69 | Client -3 | 10/8/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1A ($1,115,250) |
| Count 70 | Client -3 | 10/15/2020 | 2019 | a. Schedule A, Line 13, (Charitable Contribution Carryover) $186,925<br>b. Form 1040, Line 11b, (Taxable Income) $2,116,461 |
| Count 71 | Client -4 | 6/3/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1A ($10,255), 1B ($153,046), 1C ($16,617), 1D ($52,853)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $201,986<br>c. Form 1040, Line 43, (Taxable Income) $208,355 |

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 72 | Client -4 | 10/14/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1B ($111,525) |
| Count 73 | Client -5 | 6/3/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1A ($6,839), 1B ($102,064), 1C ($11,082), 1D ($221,824)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $320,407<br>c. Form 1040, Line 43, (Taxable Income) $267,020 |
| Count 74 | Client -5 | 10/14/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1B ($334,575) |
| Count 75 | Client -6 | 10/13/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1C ($264,711)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $510,512<br>c. Form 1040, Line 43, (Taxable Income) $456,881 |
| Count 76 | Client -6 | 04/15/2016 | 2015 | a. Schedule A, Line 18, (Charitable Contribution Carryover) $150,302<br>b. Form 1040, Line 43, (Taxable Income) $545,239 |
| Count 77 | Client -6 | 10/15/2017 | 2016 | a. Schedule A, Line 18, (Charitable Contribution Carryover) $17,530<br>b. Form 1040, Line 43, (Taxable Income) $537,564 |
| Count 78 | Client -6 | 9/19/2018 | 2017 | a. Schedule A, Line 18, (Charitable Contribution Carryover) $16,608<br>b. Form 1040, Line 43, (Taxable Income) $508,779 |
| Count 79 | Client -6 | 10/09/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1C ($446,100) |

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 80 | Client -10 | 10/05/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1E ($193,158)<br>b. Second Form 8283, Section 1, Part I, Line 1A ($15,268), 1B ($227,867), 1C ($24,741)<br>c. Schedule A, Line 17, (Non-Cash Charitable Contribution) $464,111<br>d. Form 1040, Line 43, (Taxable Income) $848,407 |
| Count 81 | Client -10 | 10/11/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1B ($446,100)<br>b. Schedule A, Line 12, (Non-Cash Charitable Contribution) $346,099<br>c. Form 1040, Line 10, (Taxable Income) $314,177 |
| Count 82 | Client -8 | 10/14/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1A ($15,073), 1B ($224,962), 1C ($24,426), 1D ($196,405)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $415,437<br>c. Form 1040, Line 43, (Taxable Income) $367,614 |
| Count 83 | Client -8 | 10/14/2016 | 2015 | a. Schedule A, Line 18, (Charitable Contribution Carryover) $45,429<br>b. Form 1040, Line 43, (Taxable Income) $488,317 |
| Count 84 | Client -8 | 10/13/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1A ($892,000) |
| Count 85 | Client -2 | 10/15/2017 | 2016 | a. Form 8283, Section 1, Part I, Line 1A ($614,860) 1B ($54,134)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $627,419<br>c. Form 1040, Line 43, (Taxable Income) $646,295 |
| Count 86 | Client -2 | 10/9/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1B ($557,625) |

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 87 | Client -2 | 10/15/2020 | 2019 | a. Schedule A, Line 13, (Charitable Contribution Carryover) $137,369<br>b. Form 1040, Line 11b, (Taxable Income) $610,365 |
| Count 88 | Client -11 | 4/3/2018 | 2017 | a. Form 8283, Section 1, Part I, Line 1A ($108,912)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $108,912<br>c. Form 1040, Line 43, (Taxable Income) $117,561 |
| Count 89 | Client -9 | 9/23/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1A ($26,427), 1B ($5,127), 1C ($76,523), 1D ($8,309)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $98,615<br>c. Form 1040, Line 43, (Taxable Income) $81,210 |
| Count 90 | Client -9 | 10/14/2016 | 2015 | a. Schedule A, Line 18, (Charitable Contribution Carryover) $17,991<br>b. Form 1040, Line 43, (Taxable Income) $92,756 |
| Count 91 | Client -9 | 10/13/2017 | 2016 | a. Schedule A, Line 18, (Charitable Contribution Carryover) $7,340<br>b. Form 1040, Line 43, (Taxable Income) $126,102 |
| Count 92 | Client -1 | 10/14/2015 | 2014 | a. Form 8283, Section 1, Part I, Line 1A ($240,524), 1B ($19,140), 1C ($285,660), 1D ($31,016)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $499,154<br>c. Form 1040, Line 43, (Taxable Income) $456,152 |
| Count 93 | Client -1 | 10/13/2016 | 2015 | a. Schedule A, Line 18, (Charitable Contribution Carryover) $15,909<br>b. Form 1040, Line 43, (Taxable Income) $539,255 |

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 94 | Client -1 | 10/14/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1B ($446,100) |
| Count 95 | Client-12 | 10/13/2019 | 2018 | a. Form 8283, Section 1, Part I, Line 1B ($111,525)<br>b. Schedule A, Line 12, (Non-Cash Charitable Contribution) $158,076<br>c. Form 1040, Line 10, (Taxable Income) $133,851 |

All in violation of Title 26, United States Code, Section 7206(2).

### Counts Ninety-Six Through One Hundred Two
*Aiding and Assisting the Filing of False Tax Returns*
(26 U.S.C. § 7206(2))

296.   The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs one through 34 and 38 through 276 of this Superseding Indictment as if fully set forth herein.

297.   On or about each approximate date set forth below, in the Northern District of Georgia and elsewhere, VICTOR SMITH did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation under the Internal Revenue Laws, of U.S. Individual Income Tax Returns, Forms 1040, and accompanying schedules for the taxpayers and calendar years specified below. The returns were false and fraudulent as to material matters, in that they represented that the taxpayers were entitled under the provisions of the Internal Revenue Laws to claim non-cash charitable contributions related to SCE Tax Shelters on Schedule A in the amounts listed on the taxpayers' returns, whereas, as SMITH then and there knew and believed, these taxpayers were not entitled to claim those non-cash charitable contributions identified below:

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 96 | Client-13 | 7/31/2017 | 2016 | a. Form 8283, Section A, Part I, Line 1 A ($204,954), B ($18,045)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $212,942<br>c. Form 1040, Line 43, (Taxable Income) $200,489 |
| Count 97 | Client-13 | 4/11/2018 | 2017 | a. Schedule A, Line 18, (Charitable Contribution Carryover) $10,057<br>b. Form 1040, Line 43, (Taxable Income) $303,580 |
| Count 98 | Client-17 | 12/8/2017 | 2016 | a. Form 8283, Section A, Part I, Line 1A ($102,4779)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $111,499<br>c. Form 1040, Line 43, (Taxable Income) $250,672 |
| Count 99 | Client-14 | 9/9/2019 | 2018 | a. Form 8283, Section A, Part I, Line 1A ($111,525)<br>b. Schedule A, Line 12, (Non-Cash Charitable Contribution) $112,025<br>c. Form 1040, Line 10, (Taxable Income) $345,238 |
| Count 100 | Client-15 | 11/11/2017 | 2016 | a. Form 8283, Section A, Part I, Line 1A ($204,954), Line 1B ($18,045)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $223,999<br>c. Form 1040, Line 43, (Taxable Income) $454,971 |
| Count 101 | Client-15 | 10/15/2019 | 2018 | a. Form 8283, Section A, Part I, Line 1A ($223,050)<br>b. Schedule A, Line 12, (Non-Cash Charitable Contribution) $223,050<br>c. Form 1040, Line 10, (Taxable Income) $231,382 |

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 102 | Client-16 | 5/28/2019 | 2018 | a. Form 8283, Section A, Part I, Line 1C ($111,525)<br>b. Schedule A, Line 12, (Non-Cash Charitable Contribution) $112,175<br>c. Form 1040, Line 10, (Taxable Income) $272,015 |

All in violation of Title 26, United States Code, Section 7206(2).

## Counts One Hundred Three Through One Hundred Six
*Subscribing to False Tax Returns*
(26 U.S.C. § 7206(1) and 18 U.S.C. § 2)

298.   The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs one through 34 and 38 through 276 of this Superseding Indictment as if fully set forth herein.

299.   On or about each approximate date set forth below, in the Northern District of Georgia and elsewhere, JACK FISHER did willfully make and subscribe false U.S. Individual Income Tax Returns, Forms 1040, and accompanying schedules, for the tax years set for below, each of which was verified by a written declaration that it was made under the penalties of perjury, and each of which was filed with the IRS, which tax returns FISHER did not believe to be true and correct as to one or more material matters. The returns were false and fraudulent as to material matters, in that they represented that FISHER was entitled under the provisions of the Internal Revenue Laws to claim non-cash charitable contributions related to SCE Tax Shelters on Schedule A in the amounts listed on his returns, whereas, as FISHER then and there knew and believed, he was not entitled to claim those non-cash charitable contributions identified below:

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|-------|----------|--------------------------|----------|--------------------------|
| Count 103 | JACK FISHER and L.F. | 10/10/2018 | 2017 | a. First Form 8283, Section A, Part I, Line 1(h)A ($109,900)<br>b. First Form 8283, Section A, Part I, Line 1(h)B ($108,911)<br>c. First Form 8283, Section A, Part I, Line 1(h)C ($80,648)<br>d. First Form 8283, Section A, Part I, Line 1(h)D ($29,867)<br>e. First Form 8283, Section A, Part I, Line 1(h)E ($82,382)<br>f. Second Form 8283, Section A, Part I, Line 1(h)A ($410,558)<br>g. Second Form 8283, Section A, Part I, Line 1(h)B ($968,100)<br>h. Second Form 8283, Section A, Part I, Line 1(h)C ($100,600)<br>i. Second Form 8283, Section A, Part I, Line 1(h)D ($244,200)<br>j. Second Form 8283, Section A, Part I, Line 1(h)E ($673,428)<br>k. Schedule A, Line 17, (Non-Cash Charitable Contribution) $745,684<br>l. Form 1040, Line 43, (Taxable Income) $836,401 |
| Count 104 | JACK FISHER and L.F. | 10/15/2019 | 2018 | a. Form 8283, Section A, Part I, Line 1(h)A ($8,629,893)<br>b. Form 8283, Section A, Part I, Line 1(h)B ($112,298)<br>c. Form 8283, Section A, Part |

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| | | | | I, Line 1(h)C ($1,338,300)<br>d. Form 8283, Section A, Part I, Line 1(h)D ($127,351)<br>e. Schedule A, Line 12, (Non-Cash Charitable Contribution) $2,257,479<br>f. Schedule A, Line 13, (Carryover from prior year) $3,388,911<br>g. Form 1040, Line 10, (Taxable Income) $5,558,551 |
| Count 105 | JACK FISHER | 10/15/2020 | 2019 | a. Form 8283, Section A, Part I, Line 1(h)A ($1,139,890)<br>b. Schedule A, Line 12, (Non-Cash Charitable Contribution) $1,139,890<br>c. Schedule A, Line 13, (Carryover from prior year) $9,397,728<br>d. Form 1040, Line 11b, (Taxable Income) $10,035,201 |
| Count 106 | JACK FISHER | 10/14/2021 | 2020 | a. Schedule A, Line 13, (Carryover from prior year) $516,366<br>b. Form 1040, Line 15, (Taxable Income) $0 |

All in violation of Title 26, United States Code, Section 7206(1) and Title 18, United States Code, Section 2.

**Counts One Hundred Seven Through One Hundred Twelve**
*Subscribing to False Tax Returns*
(26 U.S.C. § 7206(1))

300.    The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs one through 34 and 38 through 276 of this Superseding Indictment as if fully set forth herein.

301.    On or about each approximate date set forth below, in the Northern District of Georgia and elsewhere, JAMES SINNOTT did willfully make and subscribe false U.S. Individual Income Tax Returns, Forms 1040, and accompanying schedules, for the tax years set for below, each of which was verified by a written declaration that it was made under the penalties of perjury, and each of which was filed with the IRS, which tax returns SINNOTT did not believe to be true and correct as to one or more material matters. The returns were false and fraudulent as to material matters, in that they represented that SINNOTT was entitled under the provisions of the Internal Revenue Laws to claim non-cash charitable contributions related to SCE Tax Shelters on Schedule A in the amounts listed on his returns, whereas, as SINNOTT then and there knew and believed, he was not entitled to claim those non-cash charitable contributions identified below:

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 107 | JAMES SINNOTT & M.S. | 04/01/2016 | 2015 | a. Form 8283, Section A, Part I, Line 1(h)A ($224,095)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $171,640<br>c. Form 1040, Line 43, (Taxable Income) $127,857 |

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|-------|----------|--------------------------|----------|--------------------------|
| Count 108 | JAMES SINNOTT | 10/16/2017 | 2016 | a. Form 8283, Section A, Part I, Line 1(h)A ($16,332)<br>b. Form 8283, Section A, Part I, Line 1(h)B ($95,428)<br>c. Form 8283, Section A, Part I, Line 1(h)C ($286,935)<br>d. Form 8283, Section A, Part I, Line 1(h)D ($25,262)<br>e. Schedule A, Line 17, (Non-Cash Charitable Contribution) $306,094<br>f. Form 1040, Line 43, (Taxable Income) $245,767 |
| Count 109 | JAMES SINNOTT | 10/15/2018 | 2017 | a. Form 8283, Section A, Part I, Line 1(h)A ($219,798)<br>b. Form 8283, Section A, Part I, Line 1(h)B ($5,089)<br>c. Form 8283, Section A, Part I, Line 1(h)C ($6,935)<br>d. Form 8283, Section A, Part I, Line 1(h)D ($1,374,460)<br>e. Form 8283, Section A, Part I, Line 1(h)E ($1,885)<br>f. Schedule A, Line 17, (Non-Cash Charitable Contribution) $516,884<br>g. Form 1040, Line 43, (Taxable Income) $427,882 |

86

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 110 | JAMES SINNOTT and I.K. | 10/15/2019 | 2018 | a. Form 8283, Section A, Part I, Line 1(h)A ($378,655)<br>b. Form 8283, Section A, Part I, Line 1(h)B ($75,458)<br>c. Form 8283, Section A, Part I, Line 1(h)C ($601,683)<br>d. Form 8283, Section A, Part I, Line 1(h)D ($48,668)<br>e. Form 8283, Section A, Part I, Line 1(h)E ($423,835)<br>f. Schedule A, Line 12, (Non-Cash Charitable Contribution) $617,515<br>g. Form 1040, Line 10, (Taxable Income) $581,286 |
| Count 111 | JAMES SINNOTT and I.K. | 10/15/2020 | 2019 | a. Form 8283, Section A, Part I, Line 1(h)A ($161,826)<br>b. Schedule A, Line 12, (Non-Cash Charitable Contribution) $161,826<br>c. Schedule A, Line 13, (Carryover from prior year) $326,101<br>d. Form 1040, Line 11b, (Taxable Income) $472,810 |
| Count 112 | JAMES SINNOTT | 10/14/2021 | 2020 | a. Schedule A, Line 13, (Carryover from prior year) $1,128,098<br>b. Form 1040, Line 15, (Taxable Income) $1,041,640 |

All in violation of Title 26, United States Code, Section 7206(1) and Title 18, United States Code, Section 2.

**Counts One Hundred Thirteen Through One Hundred Sixteen**
*Subscribing to False Tax Returns*
(26 U.S.C. § 7206(1))

302.    The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs one through 34 and 38 through 276 of this Superseding Indictment as if fully set forth herein.

303.    On or about each approximate date set forth below, in the Northern District of Georgia and elsewhere, YEKATERINA LOPUHINA a/k/a EKATERINA LOPUKHINA a/k/a KATE JOY did willfully make and subscribe false U.S. Individual Income Tax Returns, Forms 1040, and accompanying schedules, for the tax years set for below, each of which was verified by a written declaration that it was made under the penalties of perjury, and each of which was filed with the IRS, which tax returns JOY did not believe to be true and correct as to one or more material matters. The returns were false and fraudulent as to material matters, in that they represented that JOY was entitled under the provisions of the Internal Revenue Laws to claim non-cash charitable contributions related to SCE Tax Shelters on Schedule A in the amounts listed on his returns, whereas, as JOY then and there knew and believed, she was not entitled to claim those non-cash charitable contributions identified below:

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|-------|----------|--------------------------|----------|--------------------------|
| Count 113 | YEKATERINA LOPUHINA ("JOY") | 08/15/2016 | 2015 | a. Schedule A, Line 18, (Carryover from prior year) $9,978<br>b. Form 1040, Line 43, (Taxable Income) $28,538 |

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Item(s) |
|---|---|---|---|---|
| Count 114 | YEKATERINA LOPUHINA ("JOY") | 10/16/2017 | 2016 | a. Form 8283, Section A, Part I, Line 1(h)A ($204,954)<br>b. Form 8283, Section A, Part I, Line 1(h)B ($18,045)<br>c. Form 8283, Section A, Part I, Line 1(h)C ($16,331)<br>d. Form 8283, Section A, Part I, Line 1(h)D ($95,427)<br>e. Schedule A, Line 17, (Non-Cash Charitable Contribution) $40,379<br>f. Form 1040, Line 43, (Taxable Income) $32,378 |
| Count 115 | YEKATERINA LOPUHINA ("JOY") | 10/15/2018 | 2017 | a. Form 8283, Section A, Part I, Line 1(h)A ($217,822)<br>b. Schedule A, Line 17, (Non-Cash Charitable Contribution) $184,200<br>c. Form 1040, Line 43, (Taxable Income) $165,230 |
| Count 116 | YEKATERINA LOPUHINA ("JOY") | 10/15/2019 | 2018 | a. Form 8283, Section A, Part I, Line 1(h)A ($32,115)<br>b. Form 8283, Section A, Part I, Line 1(h)A ($279,675)<br>c. Form 8283, Section A, Part I, Line 1(h)A ($223,050)<br>d. Schedule A, Line 12, (Non-Cash Charitable Contribution) $124,636<br>e. Form 1040, Line 10, (Taxable Income) $117,912 |

All in violation of Title 26, United States Code, Section 7206(1) and Title 18, United States Code, Section 2.

89

**Counts One Hundred Seventeen Through One Hundred Twenty-One**
*Subscribing to False Tax Returns*
(26 U.S.C. § 7206(1))

304.    The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs one through 34 and 38 through 276 of this Superseding Indictment as if fully set forth herein.

305.    Beginning in 2015, in addition to his salary from Accounting Firm 2, LEWIS began receiving commissions from ICM for his sale of the SCE Tax Shelters for the tax years 2014 through 2019.

306.    On or about December 4, 2015, LEWIS formed, and caused to be formed several entities for use as nominees to help conceal his receipt of commissions from the sale of units in Tax Shelters, including the following:

    a.  L Family LLC ("L Family") was a limited liability company formed in the state of Georgia in or around December 2015.

    b.  BWL Sales, Inc. ("BWL Sales") was a corporation formed in the state of Georgia in or around December 2015.   LEWIS identified his teenaged son as the sole shareholder of the entity.

    c.  HAL Inc. was a corporation formed in the state of Georgia in or around December 2015.  LEWIS identified his minor daughter as the sole shareholder of the entity.

307.    Instead of reporting the full amount of his ICM commissions on his Forms 1040 for the years 2015 through 2019, LEWIS underreported his total income by causing $307,238 of his commissions to be reported on HAL Inc.'s and BWL Sales' tax returns.   Because HAL Inc. and BWL Sales were flow-through entities, Lewis ultimately caused the commissions to be reported on his children's Forms 1040.  As a result of his unlawful assignment of income, LEWIS paid less taxes on the commission income he reported on his children's federal income tax

returns than he would have if he had correctly reported the income because it was taxed at a lower tax rate.

308.   On or about each approximate date set forth below, in the Northern District of Georgia and elsewhere, HERBERT E. LEWIS did willfully make and subscribe false U.S. Individual Income Tax Returns, Forms 1040, and accompanying schedules,  for the tax years set forth below, each of which was verified by a written declaration that it was made under the penalties of perjury, and each of which was filed with the IRS, which tax returns LEWIS did not believe to be true and correct as to one or more material matters, in that the tax returns underreported LEWIS's total income when, as the defendant LEWIS then and there well knew and believed, his total income exceeded the amounts reported on the returns as follows:

| Count | Taxpayer | Date Filed (on or about) | Tax Year | Materially False Items |
|---|---|---|---|---|
| Count 117 | HERBERT E. LEWIS | 10/20/2016 | 2015 | Line 22, Total Income, $158,454 |
| Count 118 | HERBERT E. LEWIS | 10/12/2017 | 2016 | Line 22, Total Income, $190,588 |
| Count 119 | HERBERT E. LEWIS | 4/26/2018 | 2017 | Line 22, Total Income, $253,316 |
| Count 120 | HERBERT E. LEWIS | 10/15/2019 | 2018 | Line 6, Total Income, $216,947 |
| Count 121 | HERBERT E. LEWIS | 10/13/2020 | 2019 | Line 7b, Total Income, $235,274 |

All in violation of Title 26, United States Code, Section 7206(1) and Title 18, United States Code, Section 2.

**Count One Hundred Twenty-Two through One Hundred Thirty-Five**
*Money Laundering*
(18 U.S.C. § 1957 and § 2)

309.   The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs one through 34 and 38 through 276 of this Superseding Indictment as if fully set forth herein.

310.   On or about the dates listed below, within the Northern District of Georgia and elsewhere, JACK FISHER, aided and abetted by others known and unknown to the Grand Jury, did knowingly engage and attempt to engage in the monetary transactions indicated below by, through, and to a financial institution, affecting interstate commerce knowing that such transactions involved criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is wire fraud, in violation of Title 18, United States Code, Section 1343:

| Counts | Date (on or about) | Approximate Amount | Description of Transaction |
|---|---|---|---|
| Count 122 | April 19, 2017 | $45,000 | Transfer from Preserve Communities account xx7832 to a Recreational Vehicle Company for the purchase of a Recreational Vehicle and Trailer |
| Count 123 | April 24, 2017 | $405,285 | Transfer from Preserve Communities account xx7832 to a Recreational Vehicle Company for the purchase of a Recreational Vehicle and Trailer |
| Count 124 | October 31, 2017 | $305,649.45 | Transfer from Preserve Communities account xx7832 to a Law Firm for the purchase of a home in Okatie, SC |

| Counts | Date (on or about) | Approximate Amount | Description of Transaction |
|---|---|---|---|
| Count 125 | January 24, 2018 | $101,971 | Check xx2487 from Preserve Communities account xx7832 to Car Dealer 1 for the purchase of a Mercedes model GLS 550 4Matic, VIN ending 5577 in the name of a family member |
| Count 126 | April 5, 2018 | $135,625 | Transfer from TPC Capital account xx8309 to a Law firm for the purchase of a condominium in Asheville, NC |
| Count 127 | May 22, 2018 | $135,625 | Transfer from TPC Capital account xx8309 to a Law firm for the purchase of a condominium in Asheville, NC |
| Count 128 | June 18, 2018 | $2,054,000 | Transfer from TPC Capital account xx8309 to Notary 1 for the purchase of a residence in Bonaire, a Caribbean island |
| Count 129 | October 9, 2018 | $819,798.50 | Transfer from Preserve Communities account xx7832 to a Title Company for the purchase of a home in Roswell, GA |
| Count 130 | October 28, 2018 | $926,078.55 | Transfer from TPC Capital account xx8309 to a Title Company for the purchase of a home in Markleeville, CA |
| Count 131 | December 14, 2018 | $500,000 | Transfer from TPC Capital account xx8309 to a Title Company for the purchase of a Model EA 500 airplane |
| Count 132 | December 14, 2018 | $459,451 | Transfer from Jack Fisher account xx7613 to a Title Company for the purchase of a Model EA 500 airplane |
| Count 133 | January 15, 2019 | $5,535,644 | New Hampstead Holding account xx5663 transfer to a Prior Property Owner to pay off a lien for the non-easement portion of land held in Georgia. |

| Counts | Date (on or about) | Approximate Amount | Description of Transaction |
|---|---|---|---|
| Count 134 | January 15, 2019 | $1,333,156 | New Hampstead Holding account xx5663 transfer to a Prior Property Owner to pay off a lien for the non-easement portion of land held in Georgia. |
| Count 135 | June 20, 2019 | $334,000 | Transfer from TPC Capital account xx8309 to Title Company for the purchase of lots in Alpine County, California |

All in violation of Title 18, United States Code, Section 1957 and Section 2.

## Forfeiture Provision

311.   Upon conviction of one or more of the offenses alleged in Counts Two through Thirty-Two of this Superseding Indictment, the defendants:

JACK FISHER,

JAMES SINNOTT,

YEKATERINA LOPUHINA A/K/A "EKATERINA LOPUKHINA" A/K/A "KATE JOY,"

WALTER D. ROBERTS II, A/K/A "TERRY ROBERTS,"

CLAY MICHAEL WEIBEL A/K/A CLAYTON WEIBEL,

HERBERT E. LEWIS, AND

VICTOR SMITH

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, constituting, or derived from, proceeds traceable to said violations, including but not limited to, the following:

(a)   MONEY JUDGMENT: A sum of money in United States currency representing the amount of proceeds obtained as a result of the offense,

94

or conspiracy to commit such offense, alleged in Counts Two through Thirty-Two of this Superseding Indictment.

(b)   REAL PROPERTY:

- 145 Biltmore Avenue Unit 702, Asheville, North Carolina 28801,

- 105 Goodhope Road, Okatie, South Carolina 29909,

- 7661 Little Pine Road, Marshall, North Carolina 28751,

- 717 W. Pleasant Oak Trial, Reno, Nevada 89509,

- 195 Laramie Street, Markleeville, California 96120,

- 12595 Etris Road, Roswell, Georgia 30075,

- Sabadeco Crown Keys 21, Bonaire,

- Vacant lots 5, 6, and 7 of Maps Bk. 6, Pg. 34, Parcel 002-460-005-000, Parcel 002-460-006-000, and Parcel 002-460-007-000, in Alpine County, California,

- Lots owned by Argent Land Holdings in Jasper County, SC, including Parcel Numbers 066-00-00-013, 066-00-00-014, 066-00-00-015, 067-00-01-061, 067-00-01-081, 081-00-01-036, 081-00-01-037, 081-00-01-038, 081-00-01-039.1,918.7 acres owned by Highland Property Holdings in Baldwin County, AL, including Parcel numbers 32-01-12-0-000-001.000, 32-02-10-0-000-008.000, 32-06-13-0-000-003.000, 32-01-01-0-000-001.001, 32-01-02-0-000-001.139, 32-01-11-0-000-001-067, 32-01-02-0-000-001.184,

- 1,918.7 acres owned by Highland Property Holdings in Baldwin County, AL, including Parcel numbers 32-01-12-0-000-001.000, 32-02-10-0-000-008.000, 32-06-13-0-000-003.000, 32-01-01-0-000-001.001, 32-01-02-0-000-001.139, 32-01-11-0-000-001-067, 32-01-02-0-000-001.184, and

- Lots owned by New Hampstead Holdings in Chatham County, GA, including Parcel Numbers 11039-01020, 21024-01003-2680, 21047-03002-2400, 21047-03008-401, 21047-

03010-3400, 21047-03016-2801, 21047-03019-2601, 21047-03038-2360, 21047-03038-2602, AND 81039-01024-I-16.

312.    Upon conviction of one or more of the offenses alleged in Counts One Hundred Twenty-Two through One Hundred Thirty-Five of this Superseding Indictment, defendant Jack Fisher shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 982(a)(1)(A), any property, real or personal, involved in such offense, or any property traceable to such property, including but not limited to, the following:

(a)    MONEY JUDGMENT: A sum of money in United States currency representing the amount of property, real or personal, involved in or traceable to the offenses alleged in Counts One Hundred Twenty-Two through One Hundred Thirty-Five of this Superseding Indictment.

(b)    REAL PROPERTY:

- 145 Biltmore Avenue Unit 702, Asheville, North Carolina 28801,

- 105 Goodhope Road, Okatie, South Carolina 29909,

- 7661 Little Pine Road, Marshall, North Carolina 28751,

- 717 W. Pleasant Oak Trial, Reno, Nevada 89509,

- 195 Laramie Street, Markleeville, California 96120,

- 12595 Etris Road, Roswell, Georgia 30075,

- Sabadeco Crown Keys 21, Bonaire,

- Vacant lots 5, 6, and 7 of Maps Bk. 6, Pg. 34, Parcel 002-460-005-000, Parcel 002-460-006-000, and Parcel 002-460-007-000, in Alpine County, California,

- Lots owned by Argent Land Holdings in Jasper County, SC, including Parcel Numbers 066-00-00-013, 066-00-00-014, 066-00-00-015, 067-00-01-061, 067-00-01-081, 081-00-01-036, 081-00-01-037, 081-00-01-038, 081-00-01-039.1,918.7 acres owned by Highland Property Holdings in Baldwin County,

AL, including Parcel numbers 32-01-12-0-000-001.000, 32-02-10-0-000-008.000, 32-06-13-0-000-003.000, 32-01-01-0-000-001.001, 32-01-02-0-000-001.139, 32-01-11-0-000-001-067, 32-01-02-0-000-001.184,

- 1,918.7 acres owned by Highland Property Holdings in Baldwin County, AL, including Parcel numbers 32-01-12-0-000-001.000, 32-02-10-0-000-008.000, 32-06-13-0-000-003.000, 32-01-01-0-000-001.001, 32-01-02-0-000-001.139, 32-01-11-0-000-001-067, 32-01-02-0-000-001.184, and

- Lots owned by New Hampstead Holdings in Chatham County, GA, including Parcel Numbers 11039-01020, 21024-01003-2680, 21047-03002-2400, 21047-03008-401, 21047-03010-3400, 21047-03016-2801, 21047-03019-2601, 21047-03038-2360, 21047-03038-2602, AND 81039-01024-I-16.

If, any of the property described above, as a result of any act or omission of the defendants:

(a)   cannot be located upon the exercise of due diligence;

(b)   has been transferred or sold to, or deposited with, a third party;

(c)   has been placed beyond the jurisdiction of the court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be divided without difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.


A _____*True*_____ BILL

_____
FOREPERSON

KURT R. ERSKINE
*United States Attorney*

_____
CHRISTOPHER J. HUBER
*Assistant United States Attorney*
Georgia Bar No. 545627


600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000;
Fax: 404-581-6181

BRITTNEY CAMPBELL
*Department of Justice, Tax Division Trial Attorney*
North Carolina Bar No. 31433

PARKER TOBIN
*Department of Justice, Tax Division Trial Attorney*
Virginia Bar No. 91126

CASEY SMITH
*Department of Justice, Tax Division Trial Attorney*
Connecticut Bar No. 436378


98

WILLIAM GUAPPONE
*Department of Justice, Tax Division Trial Attorney*
North Carolina Bar No. 46075